1

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich (State Bar No. 324525)
Brittany S. Scott (State Bar No. 327132)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: sbogdanovich@bursor.com
          bscott@bursor.com

2

3

4

5

6

7

*Attorneys for Plaintiff*

8

9

## UNITED STATES DISTRICT COURT

10

## EASTERN DISTRICT OF CALIFORNIA

11

12

13

KAITLYN LAWRENCE, individually and on
behalf of all others similarly situated,

Case No.

14

Plaintiff,

**CLASS ACTION COMPLAINT**

15

v.

16

FINICITY CORPORATION.,

**JURY TRIAL DEMANDED**

17

Defendant.

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

Plaintiff Kaitlyn Lawrence brings this action on behalf of herself, and all others similarly situated against Finicity Corporation ("Defendant" or "Finicity"). The following allegations are based on her counsel's investigation and upon information and belief, except for allegations concerning Plaintiff herself, which are based on personal knowledge.

<u>NATURE OF THE ACTION</u>

1.      Defendant Finicity is a criminal enterprise that mimics various national and regional banks, tricking financial technology ("FinTech") application users into giving Finicity their bank account usernames and passwords. Finicity designs fake login pages on FinTech applications. These login pages use counterfeit bank trademarks and cyberpirated URLs to impersonate banks and fool app users into giving away their bank account usernames and passwords. Figures 1 and 2, below, are different login screens allowing users to link their bank accounts to the FinTech application Every Dollar. Figure 1 is a ***real*** Chase website reached via a "private and secure" OAuth connection that transmits data only to Chase. Figure 2, on the other hand, is a ***fake*** PNC Bank login screen ***designed by Finicity to transmit usernames and passwords to Finicity, not PNC***.

**Figure 1**                                          **Figure 2**





2.      While both login screens above show a bank URL, only one of these websites is directly transmitting information to the referenced bank.  In Figure 1, the user is using a secure connection to the chase.com website and giving ***only*** Chase his or her bank account password.  In Figure 2, in contrast, the user is not connected to www.pnc.com, as the screen shows.  Instead, as shown through a browser's developer tools on Figures 3 and 4, below, the website source is actually from the https://finicity.com/ domain, which is owned and operated by Finicity.[1]  These screenshots show that the user is actually giving his or her bank account username and password to Finicity, ***not*** PNC.  Then, behind the scenes, Finicity separately logins to PNC on the users' behalf, and links the PNC account to the FinTech application.  But Finicity keeps the username and password for its own ulterior motive.

**Figure 3**



**Figure 4**

---

[1] The full URL source depicted on Figures 3-4 is:
https://connect2.finicity.com?customerID=602584466&institutionID=2866&o...5&type=lite&webhook=https%3A%2F%2Ffinicity-connect-webhook.everydollar.com.

3.      Finicity's motive is simple.  Finicity is hired by FinTech companies to link users' bank accounts to their proprietary websites and smartphone applications.  In other words, Finicity is hired to be a digital mailman, *i.e.,* send packets of information from the FinTech app to the bank website.  But being *just* a mailman doesn't pay well.  Being the mailman who opens the mail, reads it, and sells financial intelligence reports on potential creditors or high net worth individuals, on the other hand, pays very well.  To build these reports, Finicity wants 24/7, unlimited permissions and access to users' accounts.  And for that, Finicity needs usernames and passwords.  So instead of just linking bank accounts between the FinTech apps and the banks, Finicity deceptively and surreptitiously seeks out users' bank login credentials by impersonating the banks itself.

4.      Once Finicity obtains a user's bank account login credentials, it "downloads all relevant data from the customer's accounts to build [] data and analytics" on those customers.[2]  It markets and sells these insights to FinTech apps and other financial product brokers as "Smart data for lending."[3]  But "[i]t's not just about possessing best data and insights" on potential creditors.[4]  Finicity's "deep analytics allows [it] to look at a borrower's credits, debits and balances to deliver an array of rich, extensive cash flow data attributes for a more complete story of a borrower's financial situation."[5]  And with all this data, Finicity can "create… credit scoring models for simplified decisions and broad applicability."[6]  Finicity's profiling of people is so comprehensive they include attributes like their "TV and Streaming Services."[7]  A graphic depicting Finicity's attribute scoring models is shown below.  Figure 5.[8]

---

[2] Finicity Connect, https://docs.finicity.com/finicity-connect/.

[3] Finicity, https://www.finicity.com/lend/income/.

[4] *Id*.

[5] Finicity, https://www.finicity.com/lend/.

[6] *Id*.

[7] Finicity, https://www.finicity.com/experian-boost/.

[8] *Id*.

1
2
3
4
5
6
7
8
9
10
11
12



13

**Figure 5**

14      5.      Finicity calls what it does "consumer-permissioned data" collection.[9]  The Federal

15  Bureau of Investigation calls it something else: "Spoofing is when someone disguises a… website

16  URL… to convince you that you are interacting with a trusted source."[10]   The Bureau warns

17  Americans that "[p]hishing schemes often use spoofing techniques to lure you in and get you to take

18  the bait.  These scams are designed to trick you into giving information to criminals that they

19  shouldn't have access to."   In the financial industry, phishing schemes by data aggregators like

20  Finicity are euphemistically called "screen scraping."   The Department of the Treasury, Federal

21  Reserve System, and Federal Deposit Insurance Corporation note in a proposed Intra-Agency

22  Guidance memo that data aggregators like Finicity often "do not [have] a contractual relationship

23  with the bank" they impersonate, and they "use[] the customer's credentials (that the customer has

24
25

26  [9] Finicity, https://www.finicity.com/connect/

27  [10] Federal Bureau of Investigation, *Common Scams and Crimes, Spoofing and Phishing*,
    https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-
28  crimes/spoofing-and-phishing

provided) access the bank's website *as if it were the customer*."[11]   In other words, not only does Finicity pretend to be the bank in front of customers, but it also pretends to be customers in front of banks.   Another data aggregator, MX Technologies, Inc., laments that "screen scraping… has become a dirty term in some circles [because] financial institutions aren't always aware of who is scraping their data or for what end."[12]

6.    For many obvious reasons, banks hate screen scraping.   Multiple banks have accused screen scraping data aggregators like Finicity of peddling counterfeit financial services and sued them for trademark infringement and various other Lanham Act violations.[13]   The nation's biggest banks have spent years developing software to try to eliminate screen scraping.[14][15]   For large banks that successfully interrupt and catch Finicity's screen scraping, Finicity's is relegated to just linking the accounts via a secure OAuth method.   *See e.g.*, Figure 1.   Yet smaller banks with less resources cannot stop Finicity's screen scrapping themselves.   In response, groups of banks and FinTech companies have tried to set up a Financial Data Exchange to allow them to integrate accounts

---

[11] The Federal Reserve System, Docket No. OP-1752, *Proposed Intraagency Guidance on Third-Party Relationships: Risk Management* (July 12, 2021), at 66, https://www.fdic.gov/news/press-releases/2021/pr21061a.pdf.

[12] MX Technologies, Inc., *Screen Scraping vs. Bank APIs; What's The Difference*, https://www.mx.com/blog/screen-scraping-vs-bank-apis-whats-the-difference/.

[13] *See, e.g.*, *The PNC Financial Services Group, Inc. v. Plaid Inc*., 2:20-cv-01977-MRH (W.D. Pa.); *The Toronto-Dominion Bank v. Plaid Inc*., 1:20-cv-14424-RMB-MJS (D. N.J.).

[14] American Banker, *BofA, Chase, Wells Fargo pilot service to rein in screen scraping* (Jan. 26, 2021), https://www.americanbanker.com/news/bofa-chase-wells-fargo-pilot-service-to-rein-in-screen-scraping.

[15] American Banker, *JPMorgan Chase says it has fully eliminated screen scraping* (Oct. 6, 2022), https://www.americanbanker.com/news/jpmorgan-chase-says-it-has-fully-eliminated-screen-scraping.

"without having to spoof web logins."[16]  Similarly, a group of eight bank trade associations petitioned the Consumer Finance Protection Bureau to regulate data aggregators like Finicity.[17]

7.    These bank trade associations note in their petition that "[i]t is estimated that data aggregators [like Finicity] hold the consumer login credentials for tens of millions of customers… many of [whom] are unaware of the activities in which these intermediaries [like Finicity] engage, how the information is being collected, and how the data may be used or shared."[18]  Worse yet, a December 2021 consumer survey report on data privacy and financial app usage found that 73% of consumer respondents were unaware that FinTech companies have access to their bank account username and password, and 78% did not know that data aggregators like Finicity regularly access personal data even when their app is closed or deleted.[19]

8.    This is deception by design.  As Figure 2 demonstrates, Finicity intentionally misappropriates bank trademarks and URLs to lure consumers into believing they are interacting with the actual banks themselves.  Using these counterfeit marks and cyberpirated URLs, Finicity is able to trick FinTech app users to turn over their incredibly sensitive bank account credentials.  Worse yet, Finicity never discloses this surreptitious data collection to consumers.  A link to Finicity's privacy policy or terms of use does not appear anywhere on the fake login screens it designs.  In fact, Finicity misleadingly tells app users at the bottom of the screen that "Your sign-on information… will only be shared with your financial institution."  Yet Finicity fails to disclose that by interacting with its fake log-in page, the user is sharing her "sign-on information" with Finicity itself.

---

[16] Benjamin Pimintel, Protocol, *Banks and fintechs agree: It's time for screen scraping to go. So what's next?* (Oct. 5, 2021), https://www.protocol.com/fintech/fdx-financial-data.

[17] American Bankers Association, *Letters to Congress and Regulators*, https://www.aba.com/-/media/documents/letters-to-congress-and-regulators/petition-to-cfpb-for-larger-participant-rulemaking-080222.pdf?rev=c0674598829b40808a179b1f4942b591.

[18] *Id*. at 5.

[19] The Clearing House, *2021 Consumer Survey: Data Privacy and Financial App Usage* (Dec. 2021), available at https://www.theclearinghouse.org/connected-banking/consumer-research.

9.      Worse yet, such data collection is a huge threat to individuals' privacy. A dozen U.S. Senators called on the Federal Trade Commission ("FTC") to "investigate widespread privacy violations by companies [like Finicity]… that are selling private data about millions of Americans collected without their knowledge or consent."[20]  They caution that "[c]onsumers' credit and debit card transactions can reveal information about their health, sexuality, religion, political views, and many other personal details."[21]

10.     For these reasons, Plaintiff Lawrence seeks relief in this action individually, and on behalf of all individuals whose bank account usernames and passwords were collected by Finicity for violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), with the predicate criminal violation of trafficking banking and financial services using counterfeit marks under 18 U.S.C. § 2320.  Plaintiff also seeks relief in this action individually, and on behalf of all individuals whose bank account usernames and passwords were collected by Finicity for violations of the Utah Consumer Sales Practices Act under Utah Code Ann. § 13-11-4.1(2)(a) and unjust enrichment under Utah common law and equity.  Plaintiff Lawrence also seeks relief on behalf of a subclass of Californian residents for violations of California's Anti-Phishing Act, Cal. Bus. & Prof. Code § 22947.2, *et seq*.  Through this action, Plaintiff seeks to enjoin Finicity Technologies from its deceptive data collection practices, and seeks to obtain actual and statutory damages, restitution, injunctive relief, and reasonable attorneys' costs and fees.

## JURISDICTION AND VENUE

11.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 over the claims that arise under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a).

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy

---

[20] Letter from Sen. Ron Wyden et al., Cong. of the U.S., to Joseph J. Simons, Chairman, Fed. Trade Comm'n (July 31, 2020), https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf .

[21] *Id.*

1    exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a

2    citizen of a state different from Defendant.

3        13.    This Court has personal jurisdiction over Defendant because Defendant conducts

4    substantial business within California such that Defendant has significant, continuous, and pervasive

5    contacts with the State of California and purposefully directed its actions at California residents.

6        14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does

7    substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims

8    took place within this District.

9                                **PARTIES**

10       15.    Plaintiff Kaitlyn Lawrence is a resident of Orangevale, California.  Ms. Lawrence

11   downloaded the Every Dollar app on her smartphone and linked her PNC bank account to the app.

12   While on the app, she was presented with a fake login screen designed by Defendant Finicity

13   Corporation, which featured the PNC trademark and URL.  On this fake login page, she input her

14   PNC bank account username and password, believing she was interacting with PNC.  Ms. Lawrence

15   did not realize she was giving away her sensitive financial information to Finicity.  An example of

16   this fake PNC login page is reproduced below.  *See* Figure 5.



**Figure 5**

16.     Defendant Finicity Corporation is a Delaware corporation with its principal place of business in Murray, Utah.  Finicity is a software-as-a-service company that is hired by FinTech companies to link users' bank accounts to their proprietary apps and websites.

## RELEVANT FACTUAL ALLEGATIONS

**I.     Finicity Collects and Sells Insights on Individual's Financial Data**

17.     Finicity's clients are primarily FinTech companies that provide credit monitoring, financial wellness, and payment processing to consumers through smartphone applications and websites. [22]  Finicity designs and provides the software used to link FinTech applications to those consumers' bank accounts.

18.     But Finicity collects users' login credentials for purposes that far exceed the disclosed scope in at least three ways.  *First*, Finicity uses those credentials without any regard for what is needed to help the user connect their financial accounts to apps.   Rather, Finicity acquires massive quantities of data for its own purposes.  *Second*, Defendant then retains the usernames and passwords to refresh individuals' account information on an ongoing basis, whether or not the individual uses the FinTech app on a given day.  Indeed, even if the user never uses the app again, Finicity continues to collect data from their accounts on an ongoing basis.  *Third*, Finicity sells this data as part of large compilations of individual transactions that remain traceable to particular individuals.  Nowhere does the user give either the FinTech company or Finicity permission to do any of this.

19.     This undisclosed second line of business—collecting and selling those FinTech app users' sensitive financial data and insights derived from that data to those same FinTech app and other financial industry companies who wish to purchase them—is Finicity's real cash cow.  This second line of business is known in the industry as "Financial data aggregation."  According to Finicity, "Financial data aggregation is a lot less confusing than it sounds.  The process involves compiling information from different accounts—including bank accounts, credit card accounts, investment accounts, loans and other financial accounts—into a single place."[23]   "Once this

---

[22] *E.g.*, https://www.everydollar.com/.

[23] Finicity, https://www.finicity.com/blog/financial-aggregators-future-of-financial-services/

information is collected…[f]inancial institutions and financial services providers can benefit greatly."[24]  A bank can pay Finicity for insights on customers at rival banks to "help [it] draw in new customers and stay ahead of the competition."  Finicity says it can "provide[] data that can help do the following… target new customers with specific offers that will be attractive to them… [and] expand service offerings."[25]

20.     Finicity boasts that its financial data aggregation services can "take the mystery out of transaction histories."[26]  Finicity provides lenders with "the best data for credit decision making."[27] In particular, Finicity can "[a]ugment credit reports with real-time data for better credit decisioning of customers considered to be subprime," such as "cash flow analytics" and "income verification."[28] Its data "delivers the most current and accurate view of a borrower's finances."[29]



**Figure 6**

---

[24] *Id.*

[25] *Id.*

[26] Finicity, https://www.finicity.com/manage/transactions/?gclid=CjwKCAjwxr2iBhBJEiwAdXECw-VDg88glMi6wKv5hbrsKH4geNvl7v-432udPog9bKnSOM_LItvePhoCW9oQAvD_BwE.

[27] Finicity, https://www.finicity.com/auto/.

[28] *Id.*

[29] Finicity Mortgage Verification Service video, https://www.youtube.com/watch?v=9OfA8YGZPrQ.

21.     In 2020, Finicity was acquired by Mastercard for $825 million, and at the time, Finicity spokespeople noted that in addition to targeting borrowers, Finicity was also looking to actively increase aggregating wealth management data.[30]  Today, it tells its clients that it provides "added insights into customers' financial network [and] asset allocation."[31]

22.     But Finicity also has a third-line of business—running a ***protection racket***.  Instead of waiting for Finicity to steal usernames and passwords, banks can alternatively pay Finicity to set up a "direct data agreements for tokenized access" with their customers.[32]  When such data agreements are set up, Finicity tells customers their "sign-on information is not shared" and their "data will only be used with [their] permission."[33]  By implication, this means that when banks ***do not*** wet Finicity's beak, financial data is shared ***without their customers' permission*** and that Finicity does obtain their sign-in information.  Better yet, by paying Finicity its protection money, banks monitor and manage what data is leaving their platform.  It is an offer banks cannot refuse.

## II.     Finicity Deliberatively Deceives Consumers with Counterfeit Marks, Fake URLs, Half-Truths, Dark Patterns, And Fleeting Sign-In Wrap "Agreements".

23.     A December 2021 consumer survey report on data privacy and financial app usage found that a staggering 80% of consumer respondents are largely unaware that their FinTech apps use data aggregators like Finicity to gather data, that 73% of respondents are unaware that Finicity and the FinTech apps have access to their bank account usernames and passwords, and that 78% of respondents did not know that aggregators like Finicity regularly access their personal data even when the FinTech app is closed or deleted.  In Finicity's case, such deception is by design.

24.     As noted, the two most obvious points of deception are Finicity's use of counterfeit marks and cyberpirated bank URLs on the login screens themselves.  Most app users will simply turn over their usernames and passwords falsely believing they are directly interfacing with the bank

---

[30] Wealth Management, *What Mastercard's $1B Data Aggregator Finicity Deal Means for Advisors* (June 23, 2020), https://www.wealthmanagement.com/technology/what-mastercards-1b-data-aggregator-finicity-deal-means-advisors.

[31] Finicity, https://www.finicity.com/manage/wealth/.

[32] Finicity, https://www.finicity.com/open-banking/.

[33] *See* Figure 20, *infra*.

itself.  Finicity's collection of a FinTech app user's bank account credentials is not clearly disclosed.  First, a Fintech app user is prompted with a screen on the app that says "[C]onnect to your accounts to stream transactions and view balances."  Figure 7.  Once a person clicks "Connect Account" and selects their bank, they go to a new screen which is in Finicity's URL domain that states "Share your [] Bank data," and a graphic at the top depicts Finicity, a Mastercard company, linking the user's phone to the bank, signified with a counterfeit mark.  Figure 8.  After a user clicks Next, they are, then presented with a fake log-in page that collects the user's password.



| Figure 7 | Figure 8 | Figure 9 |

25.     Nowhere on Figures 8 or 9 does Finicity disclose it is a financial data analysis broker.  In fact, Figures 8 and 9 suggest the opposite.

26.     The top of the page shows a graphic of a cellphone, the mark of Finicity's parent company, and the counterfeit bank trademark.  This misleadingly implies that Finicity's role is that

of an intermediary—*i.e.*, a digital mailman—that merely "links" or "connects" a users' bank account to the smartphone app.

27.     Finicity's other representations in Figure 8 are false and misleading as well.  Even though Figure 8 originates from a Finicity URL, Finicity refers to itself in the third-person to sound as if the message comes from the originating FinTech app and states "*We* use Finicity, a Mastercard company to gather data from [the user's] bank."  This obscures Finicity's role even further and makes it seem that Finicity is only an intermediary that gathers some data on behalf of the Fintech app.  It does not disclose that Finicity itself gathers the user's bank account log-in credentials and collects all of the user's financial data for its own purposes, and later less that data in the aggregate to other companies.

28.     Worse yet, Finicity purports to enter into an agreement with FinTech app users by claiming in fine print: "By clicking **Next**, I agree to Finicity, a Mastercard company terms and conditions and privacy policy."  Sic.  This language is ineffective for several reasons.  First, it is unlikely a typical FinTech app user will appropriately notice or heed this fine print.  The fine print text is not particularly conspicuous, as it is significantly smaller than the large orange Next button at the bottom of the page.  Second, the FinTech app user has no on-going relationship with Finicity to cause them to expect to be bound by any contractual terms, let alone to be on the lookout for such terms.  Indeed, Figures 8 and 9 are the only time FinTech app users ever even interact with Finicity, and thus the typical consumer would not expect to be contractually bound by this one-off interaction.

29.     Second, the language of the fine print is vague and ambiguous, so even if a FinTech app user does notice it, she will not understand what it means.  The fine print does not say by clicking next, the user is agreeing to Finicity**'s** privacy policy.  It says: "By clicking **Next**, I agree to Finicity, a Mastercard company terms and conditions and privacy policy."  This is particularly problematic because this purports to be an adhesion contract drafted by "a Mastercard company" to be signed by an unsophisticated consumer.  Interpreting the contract against the draftsman, the most natural reading of the "I agree to Finicity" language is that, by clicking Next, the FinTech app is only agreeing to use Finicity.  The next clause, separated by a comma, is simply notice of a "terms and conditions and privacy policy."

30.     Worse yet, a consumer could not even request that Finicity delete his or her bank account credentials.  Finicity's privacy policy does not give FinTech app users the option to opt-out of collecting their bank account credentials.[34]  Instead, Finicity cautions consumers to not be fooled by phishing schemes.  "Please recognize that **protecting your Personal Information is** also **your responsibility**.  **We urge you to take every precaution to protect your Personal Information** when you are on the internet and **when you communicate with us** and with other parties through the internet.  **Change your passwords often**, use a combination of letters and numbers, and make sure you use a secure browser."[35]  Finicity's privacy policy does not inform FinTech app users—*i.e.,* suckers—that the only way to cut off Finicity's access to their bank accounts is to change their password.

31.     Indeed, several of Finicity's representations in Figures 8 and 9 are misleading and designed to lure FinTech apps users into a false sense of security.  They obfuscate the true nature of Finicity's data collection practices and keep users in the dark.

32.     This is a design decision.  Finicity's success in tricking people to hand over their sensitive bank account information is directly attributable to its use of "dark patterns."  A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do."[36] The FTC warns that "sophisticated design practices known as 'dark patterns' that can trick or manipulate consumers into… giving up their privacy."[37]

33.     The dark pattern Finicity uses most often is "misdirection."[38]  The fake login screens are a prime example.  The counterfeit bank trademarks and bank URLs at the top of the screen is

---

[34] https://www.finicity.com/privacy/.

[35] *Id.*

[36] *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c  (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[37] Federal Trade Commission, *FTC Report Shows Rise in Sophisticated Dark Patterns Designed to Trick and Trap Consumers* (Sept. 15, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/09/ftc-report-shows-rise-sophisticated-dark-patterns-designed-trick-trap-consumers.

[38] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another." https://www.darkpatterns.org/types-of-dark-pattern/misdirection .

made to draw the consumers' attention away from Mastercard's own smaller reference at the bottom of the page.  Figures 2, 9.  Moreover, Finicity is never mentioned on the log-in screens themselves.  Its name only appears in fine print on Figure 8.  This is obviously meant to confuse consumers into believing they are interacting with the bank and to turn over their username and password.  Indeed, this form of trademark misdirection has long been recognized at common law and codified in the Lanham Act.

34.     As noted above, at no point in any of this process is a user ever required to ***agree*** to Finicity's privacy policy.  Finicity never states that by using its login screen a user must agree to Finicity's privacy policy.  Finicity does not give users the ability to opt-out of Finicity's collection of bank account usernames and passwords if they want to use its service.  Better yet, because Finicity never discloses its collection of usernames and passwords on Figures 8 or 9, a user would never even feel the need to ask.

**III.    Finicity Traffics Counterfeit Trademarks to Trick People into Using Its Linking Service**

35.     Finicity's racket is selling counterfeited financial services.  To link users bank accounts on FinTech apps—and get their bank account login credentials—it uses various bank trademarks to make people believe it is either the bank, or a trusted partner of the bank.  It is not.  Below are various examples of various counterfeit trademarks Finicity uses on fake login screens (Figures 10, 13, 15, 17) compared with the actual trademarks and their USPTO registration numbers (Figures 11, 12, 14, 16, 18).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 10**

**Figure 11**

Registration Number: 2508843

Registration Date: November 20, 2001

**Figure 12**

Registration Number: 2665477

Registration Date: December 24, 2002

**Figure 13**

**Figure 14**

Registration Number: 4254628

Registration Date: February 28, 2012

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 15**

**Figure 16**

Registration Number: 5800356

Registration Date: July 9, 2019

**Figure 17**

**Figure 18**

Registration Number: 6747289

Registration Date: May 31, 2022

36.     On information and belief, Finicity has not obtained a license to use any of these trademarks in commerce.

**IV.     Finicity Deliberately Avoids Linking Bank Accounts Via "Private & Secure" Methods**

37.     As noted, many banks design software to try to catch and stop screen scrapers like Finicity from logging in to user accounts.  For many banks that Finicity knows it cannot log into because of their advanced phishing detection tools, Finicity simply links them the "Private and Secure" way—OAuth.  In Finicity's own words: "an OAuth connection… eliminates the need for the FI [Financial Institution] or Finicity from have to pass or store usernames or passwords" and provides "[i]mproved security."[39]

38.     OAuth is the industry-standard method of linking online accounts from one website or application to another.  OAuth "enables apps to obtain limited access (scopes) to a user's data *without* giving away a user's password."[40]  OAuth redirects a user from the FinTech app to the bank website, and once the user is on the bank's website, the user logs-in, and the bank's website directly asks whether user agrees to allow the bank to give the FinTech app certain permissions and access. Once the user authorizes those specific permissions, the user is then redirected back to the FinTech app.  Through OAuth, a user can *grant* certain permissions from the requesting FinTech app, but *deny* other permissions, like the ability to make transactions or access to the bank account password. What is more, through OAuth, a user can direct the bank to cut off access to the FinTech app at any time.

39.     OAuth is used not only in banking, but across the internet for other types of websites as well.  For example, if a user wants to integrate their Facebook and Twitter accounts, it must log in to Twitter to grant Facebook certain permissions to access his or her Twitter account.  A dialogue box using OAuth would look something like Figure 19.[41]

---

[39] https://docs.finicity.com/oauth-connections/

[40] Matt Raible, What the Heck is Oauth? OKTA (June 21, 2017), https://developer.okta.com/blog/2017/06/21/what-the-heck-is-oauth.

[41] *Id*.

1
2
3
4
5
6
7
8
9
10
11
12



**Figure 19**

13   40.     In Figure 19, the user was redirected from the Facebook website to the Twitter

14   website.  After logging in on the Twitter website, the user grants Facebook permission to update her

15   Twitter profile and even post to the user's Twitter account but denies Facebook permission to see

16   the user's Twitter password.  Instead, the user provides her Twitter username and password only to

17   Twitter.  Twitter then sends a "token" to Facebook, essentially confirming to Facebook that the user's

18   login to Twitter was legitimate.  Scopes are one of the "central components" and perhaps even "the

19   first key aspect" of OAuth.

20   41.     The primary reason OAuth has become the industry standard authorization protocol

21   is its ability to provide access to an individual's data without disclosing that individual's password

22   to the third-party service requesting access.  More importantly, it gives users control over their own

23   information and how that information is shared.  But this hurts Finicity's bottom line.  So it does

24   everything in its power to avoid having to link accounts via OAuth.

25
26
27
28

---

42.    However, as noted, some institutions *only* support OAuth, and have instituted anti-spoofing security measures to block data aggregators like Finicity from accessing its site.  For those banks and others that Finicity has entered into contractual agreements with, Finicity has set up Oauth connections.  For these sites, Finicity has different login screens that guide users through the OAuth connection process.





**Figure 20**                         **Figure 21**

43.    As shown above, Finicity actually tells Chase bank users that "You'll be taken to **Chase** to authenticate your accounts" and that "***sign-in information is not shared***."  Figure 20 (emphasis added).  After the user clicks the "Next" button, he or she is redirected to a secure Chase Bank website to provide their login credentials.  Figure 21.

44.    For other banks that have not gotten into agreements with Finicity, it continues to create fake login screens using counterfeit marks and cyberpirated URLs, without an option to sign in via OAuth.

## V.    Bankers and Governments Warn That Finicity Poses a Danger to Consumers

45.    Back in April 2016, J.P. Morgan & Company Chairman and Chief Executive Officer Jamie Dimon expressed "extreme[] concern[]" about "aggregators" like Finicity for several

reasons.[42]  First, he noted that "[f]ar more information is taken than the third party needs in order to do its job"; second, "[m]any third parties sell or trade information in a way [users] may not understand, and the third parties, quite often, are doing it for their own economic benefit – not for the customer's benefit"; and third, "[o]ften this is being done on a daily basis for years after the customer signed up for the services, which they may no longer be using."[43]  In March 2017, the American Bankers Association  echoed these concerns to the CFPB.[44]

46.     In response, the CFPB promulgated consumer protection principles for data aggregation by companies like Finicity on October 2017.[45]  One of these principles was "control and informed consent."[46]  This was borne out of a concern that "[m]any stakeholders express concern that consumers may not read or understand the terms presented in disclosures when they authorize third-party access to their data.  As a result, some stakeholders assert that this might impede the ability of consumers to be truly informed about how often their data are being accessed, how long their data are being retained, whether the data presented to them are accurate or complete, with whom their data are being shared, and the risks associated with sharing their data and account credentials."[47]

47.     In January 2018, the European Union explicitly banned companies like Finicity from screen scraping EU citizens by implementing its Second Payment Services Directive, which required banks to create secure APIs like OAuth.[48]  Yet screen scraping persists in the United States because it is wildly profitable for companies like Finicity.

---

[42] Jamie Dimon, *Letter to Shareholders*, (Apr. 6, 2016), https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/investor-relations/documents/2015-annualreport.pdf.

[43] *Id*.

[44] Rob Morgan, Vice President, Emerging Technologies of American Bankers Association, *Letter Response to Request for Information Regarding Consumer Access to Financial Records Docket No.: CFPB-2016-0048* (Feb. 21, 2017), https://www.aba.com/-/media/documents/comment-letter/aba-comment-cfpb-data-aggregators.pdf?rev=a5603ffb382c49059ebab1dfda631abf.

[45] https://files.consumerfinance.gov/f/documents/cfpb_consumer-protection-principles_data-aggregation_stakeholder-insights.pdf.

[46] *Id*. at 5.

[47] *Id*. at 6.

[48] https://www.ecb.europa.eu/paym/intro/mip-online/2018/html/1803_revisedpsd.en.html.

---

48.     As the years wore on, these issues only worsened.  In 2020, a dozen U.S. Senators asked the Federal Trade Commission ("FTC") to investigate privacy violations from data aggregators like Finicity.[49]  Two years later, a consortium of eight bank trade groups petitioned the CFPB to regulate the activities of data aggregators like Finicity.[50]  However, to date, no single agency has been able to stop this practice.

**VI.     Plaintiff And Class Members Are Harmed By a Loss of Indemnification, Property, and Privacy Rights, Are at Increased Risk of Identity Theft And Fraud, And Have Lost Control Over Their Private Information.**

49.     Finicity's actions harm Plaintiff in various ways.

50.     First, by unwittingly sharing her bank account credentials with Finicity, Plaintiff loses indemnification rights under federal banking regulations.  Under these regulations, a consumer's liability for unauthorized electronic fund transfers from his or her financial accounts is generally capped at $50.  *See, e.g.*, 12 C.F.R. §§ 1005.2(m) and 1005.6(b).  However, by giving Finicity their bank account credentials, consumers, like Plaintiff lose these federal indemnification rights in some circumstances.  So, if a rogue actor at the Defendant uses a consumers' credentials to access and improperly transfer funds from their accounts, the consumer's bank will consider that transfer to have been authorized because they initially gave the credentials away to Finicity.

51.     Thus, if the rogue actor transfers $10,000 from Plaintiff's account, instead of losing $50, Plaintiff will lose the full amount of the transferred funds.  By removing Plaintiff and Class members' data from their bank's secure environment and storing it in Finicity's own computer systems, networks or servers, Finicity destroys the rights and protections to which Plaintiff and Class members are otherwise entitled.

52.     That amounts to a present economic loss to Plaintiff and Class members.  Just like an insurance policy, the federal indemnification right has a present economic value, and that value of is

---

[49] Letter from Sen. Ron Wyden et al., Cong. of the U.S., to Joseph J. Simons, Chairman, Fed. Trade Comm'n (July 31, 2020), https://www.wyden.senate.gov/imo/media/doc/073120%20Wyden%20Cassidy%20Led%20FTC%20Investigation%20letter.pdf .

[50] American Banker, *Banks ask CFPB to Crack Down on Data Aggregators*, https://www.americanbanker.com/news/banks-ask-cfpb-to-crack-down-on-data-aggregators.

1   immediately diminished by Finicity obtains their passwords.  And just as insurance companies

2   analyze and create valuations of future risk when creating premiums and underwriting policies, here

3   too, the present loss or diminishment of Plaintiff and Class members' indemnification rights is

4   readily capable of a dollars and cents valuation.  This is a cognizable, present, economic harm that

5   occurs even if a particular Plaintiff or Class member's account is not compromised.  And this readily

6   quantifiable injury is capable of being redressed by a decision in this action.

7       53.    Second, there is an economic value to the financial data that Finicity collects,

8   analyzes, and sells about Plaintiff and Class members.  The consumer data market has been valued

9   at $200 billion.[51]  Plaintiff and Class members not only have an economic interest in their own

10  information, but also possess a means of commoditizing it on their own terms.

11      54.    There are numerous companies that offer tools to allow individuals to monetize their

12  own internet browsing data.[52][53]  For example, Brave is a web browser that allows consumers to surf

13  the internet free of surveillance (unlike some other browsers), while offering the option to allow

14  Brave to observe their activity and collect data in exchange for basic attention token ("BAT"), a

15  currency that can be traded for approximately one dollar per BAT.[54]  Brave estimated in 2020 a user

16  would be able to earn between $60 and $70 that year—and possibly over $200 in 2020—by selling

17  access to their data through the Brave software.[55]  As of April 2023, there is over $400 million in

18  BAT outstanding, with as much as $10 million worth of the currency traded per day.[56]

19      55.    Indeed, a company called Datacoup paid consumers up to $8 per month for access to,

20  among other things, their credit card transaction data.  But Datacoup dissolved because it could not

---

[51] Catherine Tucker, Harvard Business Review, *Buying Consumer Data? Tread Carefully* (May 1, 2020), https://hbr.org/2020/05/buying-consumer-data-tread-carefully.

[52] Lotame, https://www.lotame.com/how-to-monetize-your-data/.

[53] Brave, https://brave.com/.

[54] Michael Kan, PC Magazine, *Brave Browser Will Pay You to View Ads (But There's a Catch)*, (Jan. 15, 2019), https://www.pcmag.com/news/brave-browser-will-pay-you-to-view-ads-but-theres-a-catch.

[55] *Id.*

[56] Coincap.io Data Market Website (last visited April 17, 2023), https://coincap.io/.

achieve the same scale as companies like Finicity, which harvests data from millions of consumers for free by using deceptive tactics.  As *Forbes* reported at the time, "The problem for such new companies is that marketers will not pay much for details about just thousands of people when data brokers who pay nothing to individuals offer detailed dossiers on millions."[57]  Finicity's unlawful conduct is a substantial factor preventing the developing a market for Plaintiff and Class members to sell access to their data on their terms.  Finicity has thus deprived consumers of the value of their data.  This amounts to an economic loss of money to Plaintiff and Class members, which is also capable of quantification.

56.      Indeed, Finicity built its entire business by collecting and selling Plaintiff and Class members' financial data.  In 2020, it was valuation was $825 million.  Today, Finicity is worth much more.

57.      By stealing Plaintiff and Class members' data without their informed consent, Finicity impedes the possibility of a robust and equitable market for consumer data where Plaintiff and Class members could be compensated.

58.      Third, Finicity increases the risk that Plaintiff and Class members' accounts will be compromised.  By collecting and aggregating Plaintiff and Class members' data, Finicity is an ideal target for hackers and identity thieves.  What is more, Finicity collects and shares this data with other fourth, fifth, and sixth parties.  These individuals also become targets for hackers and identity thieves.  So, whereas before, a hacker could only obtain Plaintiff and Class members' financial data through either the users' or their banks themselves, Finicity has multiplied the number of targets for malicious actors.  It is hard to keep a password secret between just two people.  It is even harder to keep it secret with three or more people.

59.      The increased risk of identity theft inflicts real economic costs on Plaintiff and Class members because it necessitates ongoing costly credit monitoring services.

---

[57] Adam Tanner, Forbes Magazine, *Others Take Your Data for Free, This Site Pays Cash* (March 3, 2019), https://www.forbes.com/sites/adamtanner/2014/03/03/others-take-your-data-for-free-this-site-pays-cash/?sh=5c62f4679461.

60.     Moreover, given the secret, undisclosed nature of Defendant's data collection practices, Plaintiff anticipate that discovery and expert analysis are likely to demonstrate additional types of economic loss or damage and/or damage to money and property and reserve their rights to amend this Complaint to assert those theories at the appropriate time.

## TOLLING, CONCEALMENT, AND ESTOPPEL

61.     The statutes of limitation applicable to Plaintiff and Class members' claims are tolled as a result of Finicity's knowing and active concealment of its conduct alleged herein.  Among other things, Finicity designs its software to deceive users into thinking that they are interacting directly with their banks when providing login credentials to facilitate a connection between their bank accounts and a third-party service.  Finicity also fails to disclose to each individual user—either through its own privacy policy, website, or other document—that it stores the bank login information provided in such login transactions and use those credentials to collect financial data from the individual's bank accounts on an ongoing basis, even though the individual never consented to such data collection.  Nor does Defendant inform each individual user that this data collection will continue even if the individual revokes the permissions granted to the third-party service it sought to connect to her bank account.  By these actions, Finicity intentionally concealed the nature and extent of its data collection operation to maximize profits resulting from the sale of Plaintiff and Class members' highly sensitive financial information.

62.     Plaintiff and Class members could not, with due diligence, have discovered the full scope of Finicity's conduct, due to Finicity's deliberate efforts to conceal it.  All applicable statutes of limitation also have been tolled by operation of the discovery rule.  Under the circumstances, Finicity was under a duty to disclose the nature and significance of its data and privacy policies and practices but did not do so.  Finicity is therefore estopped from relying on any statute of limitations.

63.     Further, this Complaint alleges a continuing course of unlawful conduct by which Finicity has inflicted continuing and accumulating harm within the applicable statutes of limitations.

64.     Each time Finicity engaged in an unlawful act complained of here, Finicity undertook an overt act that has inflicted harm on Plaintiff and other members of the Classes.

65.     For these reasons, the statutes of limitations have been tolled with respect to the claims of Plaintiff and members of the Classes asserted in this Complaint.

66.     Defendant's fraudulent concealment and omissions are common to Plaintiff and all Class members.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this matter on behalf of themselves and those similarly situated in the following Classes:

> **Nationwide Class**: All natural persons in the United States whose accounts at a financial institution were accessed by Finicity using Finicity's software incorporated in a mobile or web-based FinTech app from 2014 to the present.

> **California Subclass**: All natural persons in the United States whose accounts at a financial institution were accessed by Finicity using Finicity's software incorporated in a mobile or web-based FinTech app from 2014 to the present.

68.     Excluded from each of the Classes are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

69.     The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class and Subclass members is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant and its agents.

70.     Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based on, inter alia, changing circumstances and new facts obtained.

71.     <u>Numerosity:</u> Class and Subclass Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class and Subclass Members described above who have been damaged by Defendant's Data harvesting.

72.     <u>Commonality:</u> The questions of law and fact common to the Class and Subclass members which predominate over any questions which may affect individual Class Subclass members include, but are not limited to:

    a.    Whether Defendant is responsible for the conduct alleged herein, which was solicit and induce Plaintiff and Class members to provide identifying information by represent itself as being a financial institution without the authority or approval a that financial institution;

    b.    Whether Defendant's conduct was unlawful;

    c.    Whether Defendant's conduct violated Cal. Bus. & Prof. Code § 22948.2;

    d.    Whether Defendant's conduct violated Utah Code Ann. § 13-11-4.1(2)(a);

    e.    Whether Defendant's conduct violated 18 U.S.C. § 2320;

    f.    Whether Plaintiff and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement;

    g.    Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief;

    h.    Whether Plaintiff and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

73.     <u>Typicality:</u> Plaintiff Kaitlyn Lawrence is a member of the Classes she seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class and Subclass was susceptible to the same conduct and turned over their bank account usernames and passwords to Defendant. Plaintiff is entitled to relief under the same causes of action as the other Class and Subclass members.

74.     <u>Adequacy:</u> Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the Class and Subclass members she seeks to represent; her claims are

common to all other members of the Classes and they have a strong interest in vindicating their rights; she has retained counsel competent and experienced in complex class action litigation and they intend to vigorously prosecute this action.  Plaintiff has no interests which conflicts with those of the Classes.  The Class Members' interests will be fairly and adequately protected by Plaintiff and her counsel.  Defendant has acted in a manner generally applicable to the Classes, making relief appropriate with respect to Plaintiff and the Class and Subclass Members.  The prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent and varying adjudications.

75.     Further, a class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class and Subclass members is impracticable.  Additionally, the expense and burden of individual litigation would make it difficult or impossible for the individual Class members to redress the wrongs done to them, especially given the costs and risks of litigation as compared to the benefits that may be attained.  Even if the Class members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments.  By contrast, a class action presents fewer management difficulties and provides the benefit of single adjudication and comprehensive supervision by a single forum.

76.     Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class and Subclass, thereby making it appropriate for this Court to grant declaratory relief with respect to the Class and Subclass as a whole.

### COUNT I
### Violation of The Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(a))
### On Behalf of Plaintiff and Nationwide Class Members

77.     Plaintiff and Class members reallege and incorporate by reference each allegation set forth above as if fully set forth herein.

78.     Plaintiff Lawrence brings this Count individually and on behalf of the members of the proposed Class against Defendant.

79.     Defendant Finicity is a person within the meaning of 18 U.S.C. § 1961(3) because it is a corporation organized under laws of Delaware.

80.     Defendant Finicity is an enterprise within the meaning of 18 U.S.C § 1961(4) because it is a corporation organized under laws of Delaware.

81.     18 U.S.C. § 2320(a) provides: "Whoever intentionally traffics in…services and knowingly uses a counterfeit mark… in connection with such… services… shall be punished." Trafficking in counterfeiting services under 18 U.S.C. § 2320 is listed as a type of "racketeering activity" under RICO, 18 U.S.C. § 1961(1).

82.     Defendant Finicity has engaged in a pattern of racketeering activity.  Finicity has repeatedly violated 18 U.S.C. § 2320(a) by trafficking counterfeit marks of financial institutions in connection with its bank account linking services by using such counterfeit marks on fake login screens on various FinTech apps, including, but not limited to, Every Dollar.  Finicity has done this systematically and continuously, before Plaintiff and each Class member.

83.     A counterfeit mark is defined as "a spurious mark (i) that is used in connection with trafficking in any… services (ii) that is identical with… a mark registered on the principal register in the United States Patent and Trademark Office and in use (iii) that is… used in connection with the… services for which the mark is registered with the United States Patent and Trademark Office… (iv) the use of which is likely to cause confusion, to cause mistake, or to deceive."   18 U.S.C. § 2320(f)(1).

84.     As shown in Figures 10 through 18, above, Defendant Finicity used counterfeit marks under 18 U.S.C. § 2320(f)(1) by (i) using marks on login pages in connection with Finicity's bank account linking service, (ii) the marks Finicity used were identical with marks owned by financial institutions that were registered on the principal register, (iii)  Finicity's use of its marks were in connection with the same services for which the marks owned by financial institutions were registered on the principal register for—namely, Class 36 services, which include financial, monetary, and banking services, and financial information, data, advice, and consultancy services,

(iv) Finicity's use of these identical marks were likely to, and did in fact, cause confusion, mistake and deception.

85.     Defendant Finicity has received income derived both directly and indirectly from this pattern of racketeering activity.   In particular, Finicity sold financial information derived from Plaintiff and Class members' bank accounts, which it was able to access by using counterfeit marks to trick Plaintiff and Class members into giving Finicity their bank account credentials.

86.     Defendant Finicity intentionally trafficked in counterfeit marks by repeatedly using them on its various login screens, as exemplified in Figures 10 through 18, above.  Finicity knew the marks it was using were identical to those of other financial institutions.  Finicity knew its use of these identical marks was likely to cause confusion and make people mistakenly believe the login screen screens were on the real financial institution's website.  Indeed, confusing and deceiving FinTech app users into believing they were interacting with the financial institutions in question was the entire point of Finicity's actions.

87.     As described herein, Defendant Finicity has engaged in a pattern of racketeering activity by repeatedly using these counterfeit marks on fake login screens on various FinTech apps.

88.     This racketeering activity had an effect on interstate commerce, as Finicity collected bank account usernames and passwords from Plaintiff and Class members throughout the United States and sold financial data and insights about Plaintiff and Class members to companies throughout the United States and beyond.

89.     Plaintiff and Class members are "persons" under 18 U.S.C. § 1961(3).

90.     Plaintiff and Class members were injured by Defendant Finicity's actions as described above.  This injury included the loss of their regulatory indemnification rights by handing over their bank account credentials to a third-party, the loss over the economic value of their financial data, and increased risk of identity theft, which necessitates ongoing costly credit monitoring services.

91.     But for Defendant Finicity's action, Plaintiff and Class members would not have suffered these injuries.

92.     Plaintiff and Class members' injuries arising out of their disclosure of their bank login credentials to Defendant Finicity was proximately caused by Defendant Finicity's trafficking in

counterfeiting bank trademarks.  There is a direct relationship between Plaintiff and Class members' injuries and Defendant Finicity's conduct.  There is no intervening cause that contributed to Plaintiff and Class members giving Defendant Finicity their bank account usernames and passwords.  The sole cause was Finicity's trafficking of counterfeit marks.  Indeed, such confusion and mistaken provision of bank account credentials is reasonably foreseeable and the natural consequence of trafficking in counterfeit bank marks.  And by law, the loss of indemnification rights for electronic fund transfers is directly tied to the provision of one's bank account credentials. *See* 12 C.F.R. §§ 1005.2(m) and 1005.6(b).  Moreover, the increased risk of identity theft, and the loss of control of valuable financial data is also directly tied to the provision of one's bank account credentials to third-parties.

## COUNT II
### Violation of The Utah Consumer Sales Practices Act (Utah Code Ann. § 13-11-4.1(2)(a)) On Behalf of Plaintiff and Nationwide Class Members

93.     Plaintiff and Class members reallege and incorporate by reference each allegation set forth above as if fully set forth herein.

94.     Plaintiff Lawrence brings this Count individually and on behalf of the members of the proposed Class against Defendant.

95.     The Utah Consumer Sales Practices Act prohibits Utah businesses like Finicity Corporation from engaging in numerous kinds of deceptive acts.  Section 13-11-4.1(2)(a) makes it unlawful for "[a] supplier who is not the financial institution of an account holder may not represent, directly or indirectly, that the supplier is the financial institution of the account holder."  This section went into effect on May 12, 2020, shortly before Defendant Finicity was acquired by Mastercard.

96.     Defendant Finicity is a "supplier" within the meaning of the Utah Consumer Sales Practices Act.  Section 13-11-3(6) provides: "'Supplier' means a[n]… offeror… who regularly… engages in… consumer transactions, whether or not he deals directly with the consumer."  And section 13-11-3(2)(a) provides: "'Consumer transaction' means a… disposition of… services… to, or apparently to, a person for: (i) primarily personal, family, or household purposes." Defendant Finicity is thus a supplier because it is an "offeror" of "a disposition of services" to persons for

"primarily personal, family, or household purposes."  Defendant provides bank account linking services for personal budgeting applications, which are used by persons for "primarily personal, family, or household purposes."

97.    Plaintiff and Class members are "consumers" under the Utah Consumer Sales Practices Act because they are persons that received this disposition of services from Defendant Finicity.

98.    Defendant Finicity is not a "financial institution" within the meaning of section 13-11-4.1 because it is not a "(i) state or federally chartered bank, savings and loan association, savings bank, industrial bank, or credit union, (ii) "any other institution under the jurisdiction of the commissioner of Financial Institutions as described in Title 7, Financial Institutions Act [which additionally covers "loan and trust companies" and "trust businesses"]; or (iii) a person who… is subject to Title 61, Chapter 2c… and engages in the business of residential mortgage loans." "Business of residential mortgage loans," as defined in Title 61, Chapter 2c, "means for compensation or in the expectation of compensation to: (A) engage in an act that makes an individual a mortgage loan originator; (B) make or originate a residential mortgage loan; (C) directly or indirectly solicit a residential mortgage loan for another."  Utah Code Ann. § 61-2c-102.  Defendant Finicity does not engage in any of these activities.

99.    As described herein, Defendant Finicity has directly and indirectly represented itself to be the financial institution[s] that Plaintiff and class members held accounts in, and thereby violated Utah Code Ann. § 13-11-4.1(2)(a).  In fact, the law requires the Court to presume that Defendant Finicity has violated this law because: "the use or reference to the name, trade name, or trademark of the financial institution of the account holder, unless the supplier has written authorization from the financial institution…  establish[es] a presumption that the supplier is representing that the supplier is the financial institution of the account holder in violation of Subsection (2)(a)."  Utah Code Ann. § 13-11-4.1(2)(b).

100.    "A supplier who violates this section commits a deceptive act or practice under Subsection 13-11-4(1)."  Utah Code Ann. § 13-11-4.1(4).

101.    Consumers who suffer losses because of a violation of this chapter can either seek actual damages or statutory damages of $2,000 per violation.  Utah Code Ann § 13-11-19(2).    And consumers alleging deceptive acts declared to violate section 13-11-4 can bring class actions for actual damages.  Utah Code Ann § 13-11-19(4)(a).

**COUNT III**
**Unjust Enrichment (Utah Common Law and Equity)**
**On Behalf of Plaintiff and Nationwide Class Members**

102.    Plaintiff and Class members reallege and incorporate by reference each allegation set forth above as if fully set forth herein.

103.    Plaintiff Lawrence brings this Count individually and on behalf of the members of the proposed Class against Defendant.

104.    Plaintiff and Class members conferred Defendant Finicity a benefit by providing it with the financial information contained in their bank accounts.  This benefit was direct, and not incidental, to Plaintiff and Class members' provision of bank account credentials to Defendant Finicity, on the fake log-in pages described above.

105.    Defendant Finicity appreciated and knew it received this benefit, as it was able to monetize the benefit by selling insights on Plaintiff and Class members to interested third-parties for immense profit.

106.    Allowing Defendant Finicity to retain this benefit under these circumstances would be unjust because Defendant Finicity was only able to obtain the benefit under false pretenses and through deception.

107.    Plaintiff and Class members lack an adequate remedy at law to be able to recover this same benefit.

**COUNT IV**
**Violation of The California Anti-Phishing Act (Cal. Bus. & Prof. Code § 22948.2)**
**On Behalf of Plaintiff and California Subclass Members**

108.    Plaintiff and California Subclass members reallege and incorporate by reference each allegation set forth above as if fully set forth herein.

109.     Plaintiff Lawrence brings this Count individually and on behalf of the members of the proposed California Subclass against Defendant.

110.     The California Anti-Phishing Act of 2005 (the "Anti-Phishing Act") makes it unlawful to use the Internet "to solicit, request, or take any action to induce another person to provide identifying information by representing itself to be a business without the authority or approval of the business."  Cal. Bus. & Prof. Code § 22948.2.  "Identifying information" includes bank account numbers, account passwords, and "[a]ny other piece of information that can be used to access an individual's financial accounts."  Cal. Bus. & Prof. Code § 22948.1(b).  An individual who is adversely affected by a violation of Section 22948.2 may bring an action.  Cal. Bus. & Prof. Code § 22948.3(a)(2).

111.     As described herein, Defendant violated the Anti-Phishing Act by representing itself to be Plaintiff and California Subclass members' financial institutions.  Defendant fraudulently and deceitfully impersonated those institutions to induce Plaintiff and California Subclass members to provide their login credentials to Defendant, as described herein.  Defendant did so without obtaining the authority or approval of each financial institution.

112.     Plaintiff and California Subclass members have been adversely affected by Defendant's violations of the Anti-Phishing Act because Defendant engaged in this deceitful conduct to extract from Plaintiff and California Subclass members their login credentials and all of the transaction history and other data accessible with those credentials, as detailed above.  Defendant caused actual injury, harm, damage and loss to Plaintiff and California Subclass members for the reasons described herein.

113.     Plaintiff and California Subclass members are entitled to relief under Cal. Bus. & Prof. Code § 22948.3(a)(2), including $5,000 per violation; which should be trebled because Defendant engaged in a pattern and practice of violating § 22948.2 (indeed, it is the essence of Defendant's business model); an injunction against further violations; costs of suit and reasonable attorney's fees; and such other relief as the Court may deem just and proper.

1

**PRAYER FOR RELIEF**

2

    **WHEREFORE**, Plaintiff, individually and on behalf of the members of the Class and

3

California Subclass, prays for judgment as follows:

4

       (a)    Declaring this action to be a proper class action and certifying Plaintiff as the

5

representative of the Class and Subclass, and Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

6

       (b)    An order declaring Defendant's conduct violates the Racketeering Influenced and

7

Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 and 2320, the Utah Consumer Sales Practices Act ("UCSPA"), Utah Code Ann. §§ 13-11-4 and 13-11-

8

4.1, and the California Anti-Phishing Act ("CAPA"), Cal. Bus. & Prof. Code § 22948.2;

9

10

       (c)    Awarding trebled actual damages to each member of the Class under RICO;

11

       (d)    Awarding $2,000 in statutory damages to each member of the Class, or alternatively, awarding $2,000 in statutory damages to Plaintiff individually and

12

actual damages to each member Class under the UCSPA;

13

       (e)    Awarding lost profits to each member of the Class under the Utah Common law and

14

equity;

15

       (f)    Awarding $15,000 in trebled statutory damages to each member of the California Subclass under the CAPA;

16

       (g)    Awarding Plaintiff and Class and Subclass Members their costs and expenses

17

incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

18

       (h)    Granting such other and further relief as the Court may deem just and proper.

19

20

**JURY TRIAL DEMANDED**

21

    Under Federal Rule of Civil Procedure 38, Plaintiff, individually and on behalf of the

22

members of the Classes, exercises her right under the Seventh Amendment to the United States

23

Constitution and demands a trial by jury.

24

25

Dated: May 26, 2023               **BURSOR & FISHER, P.A.**

26

                        By:    /s/ *Stefan Bogdanovich*

27

                        Stefan Bogdanovich (State Bar No. 324525)
Brittany S. Scott (State Bar No. 327132)

28

                        1990 North California Blvd., Suite 940

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: sbogdanovich@bursor.com
        bscott@bursor.com

*Attorneys for Plaintiff*