1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KAITLYN LAWRENCE, individually and          No.  2:23-cv-01005-DJC-AC
      on behalf of all others similarly
12    situated,

13              Plaintiff,

14                                                 ORDER DENYING MOTION TO COMPEL
         v.                                        ARBITRATION (ECF NO. 17) AND
15                                                 GRANTING IN PART AND DENYING IN
      FINICITY CORPORATION,                        PART MOTION TO TRANSFER VENUE,
16                                                 OR, IN THE ALTERNATIVE, DISMISS
                Defendant.                         COMPLAINT (ECF NO. 19)
17

18

19       Plaintiff Kaitlyn Lawrence brings an action on behalf of herself and putative sub-

20   classes of national and California consumers that used an application, website, or

21   online or Internet service provided by Defendant Finicity Corporation ("Finicity").

22   According to the Complaint, Finicity allegedly used counterfeit trademarks to:

23   (1) impersonate financial institutions, (2) acquire login credentials from consumers

24   who thought that they were interacting with their financial institution, and (3) collect

25   and curate consumer data related to their financial institution's account to then re-

26   package and sell to other businesses in the "financial technology" or "FinTech"

27   industry.  As a result, Plaintiff alleges that Finicity has violated the federal Racketeering

28   Influenced and Corrupt Organizations Act ("RICO"), Utah's Consumer Sales Practices

                                            1

Act ("UCSPA"), unjust enrichment principles under Utah common law and equity, and California's Anti-Phishing Act ("CAPA").  Finicity now seeks to compel arbitration of Plaintiff's claims based on its Terms and Conditions, which contains a delegation clause.  In the alternative, Finicity seeks transfer of the case to the federal district court in the District of Utah under 28 U.S.C. § 1404(a), or dismissal of Plaintiff's claims for various reasons, including for failing to establish Article III and statutory standing.

For the reasons set forth below, because the Court concludes that Finicity did not provide reasonably conspicuous notice of the arbitration provision, such that Plaintiff did not consent to it, the Court denies Finicity's Motion to Compel Arbitration (ECF No. 17).  Further, while the Court rejects Finicity's challenges to the state law claims on the basis of Article III standing, the Court concludes that Plaintiff has not established Article III or statutory standing under RICO, and, accordingly, dismisses the first cause of action of the Class Action Complaint (ECF No. 1) with leave to amend.  However, the Court concludes that Plaintiff has sufficiently pled causes of action under California's Anti-Phishing Act, California Business & Professions Code section 22948, *et seq.*, and the Targeted Solicitations Ban under Utah's Consumer Sales Practices Act, Utah Code Annotated § 13-11-19.  As for venue, Finicity fails to show that transfer would amount to more than a shift in burden, which is not enough to override Plaintiff's preferred choice of forum in her home venue of the Eastern District of California.  Therefore, the Court denies the remainder of Finicity's requests in its Motion to Transfer Venue or, in the Alternative, Dismiss Complaint (ECF No. 19).

## BACKGROUND

### I.     Factual Allegations

#### A.     The Parties

Plaintiff lives in Sacramento County, where she "downloaded the Every Dollar app on her smartphone and linked her PNC bank account to the app."  (Class Action Compl. (ECF No. 1) ¶ 15 ("Complaint" or "Compl.").)  Plaintiff alleges that while on the Every Dollar app, "she was presented with a fake login screen designed by" Finicity,

1    "which featured the PNC trademark and URL."  (*Id.*)  "On this fake login page, she

2    input her PNC bank account username and password, believing [that] she was

3    interacting with PNC."  (*Id.*)  Plaintiff "did not realize [that] she was giving away her

4    sensitive financial information to Finicity."  (*Id.*)

5         Finicity is a "software-as-a-service company that is hired by FinTech companies

6    to link users' bank accounts to their proprietary apps and websites."  (Compl. ¶ 16.)

7    Finicity is domiciled in Utah (principal place of business) and in Delaware (state of

8    incorporation).  (*See id.*)  "Finicity's clients are primarily FinTech companies that

9    provide credit monitoring, financial wellness, and payment processing [services] to

10   consumers through smartphone applications and websites."  (*Id.* ¶ 17 (citing Every

11   Dollar's website as an example of one client).)  "Finicity designs and provides the

12   software used to link FinTech applications [and services] to those consumers' bank

13   accounts."  (*Id.*)

14        **B.      Finicity's Alleged Practices**

15        According to the Complaint, "Finicity collects users' login credentials for

16   purposes that far exceed the disclosed scope [of the Terms and Conditions and

17   Privacy Policy] in at least three ways."  (Compl. ¶ 18.)  Finicity allegedly: (1) uses the

18   credentials for consumers "without any regard for what is needed to help the user

19   connect their financial accounts to apps[,]" and instead "acquires massive quantities of

20   data for its own purposes[;]" (2) "then uses the usernames and passwords to refresh

21   individuals' account information on an ongoing basis, whether or not the individual

22   uses the FinTech app on a given day[,]" and "even if the user never uses the app

23   again[;]" and (3) finally "sells this data as part of large compilations of individual

24   transactions that remain traceable to particular individuals."  (*Id.*)  "Nowhere does the

25   user give either the [financial technology] company or Finicity permission to do any of

26   this."  (*Id.*)

27        Finicity calls the above-described practice, "Financial data aggregation."

28   (Compl. ¶ 19.)  According to Finicity: "Financial data aggregation is a lot less

confusing than it sounds.  The process involves compiling information from different accounts—including bank accounts, credit card accounts, investment accounts, loans and other financial accounts—into a single place." (*Id*. ¶ 19 and n.23 (quoting Finicity's website).)  Crucially, Finicity sells the insights it gathers from consumers based on its financial data aggregation to rival banks to attract new customers and "provide[ ] data that can help . . . target new customers with specific offers that will be attractive to them . . . [and] expand service offerings." (*Id*. ¶ 19 and n.25 (quoting Finicity's website) (first omission added).)  Apparently, Finicity's financial data aggregation "provides lenders with 'the best data for credit decision making[,]'" and "can '[a]ugment credit reports with real-time data for better credit decisioning of customers considered to be subprime,' such as 'cash flow analytics' and 'income verification.'" (*Id*. ¶ 20.)  Finicity "delivers the most current and accurate view of a borrower's finances." (*Id*. ¶ 20 and nn. 28–29 (citations to Finicity's website omitted).)

In the course of this financial data aggregation, Finicity allegedly engages in certain deceptive practices. (*See* Compl. ¶ 23; *also id*. ¶¶ 35–36 (providing copies of some trademarks Finicity has allegedly counterfeited).)  Plaintiff complains that Finicity uses counterfeit marks and URLs that are cyberpirated[1] or deceptively use common names for legitimate businesses without permission on the login screen themselves, such that "[m]ost app users will simply turn over their usernames and passwords falsely believing [that] they are directly interfacing with the bank itself." (*Id*. ¶ 24.) Plaintiff also complains that Finicity does not disclose that it collects user's financial institution credentials. (*See id*.)  According to the Complaint, nowhere across three separate sign-in windows "does Finicity disclose [that] it is a financial data analysis broker.  In fact, [the last two sign-in windows] suggest the opposite." (*Id*. ¶ 25; *see id*. ¶ 24 (providing Figures 7, 8, and 9 depicting the three separate sign-in windows).)

---

[1] *See Cyberpiracy*, *Black's Law Dictionary* (11th ed. 2019) ("The act of registering a well-known name or mark (or one that is confusingly similar) as a website's domain name, usu[ally] for the purpose of deriving revenue."); 15 U.S.C. § 1125(d) (codifying amendments to the Lanham Act that added the Anticybersquatting Consumer Protection Act of 1999).

This case ultimately revolves around the disclosure contained in the second window and the visual presentation of it, as depicted in Figure 8, which is provided in Appendix A.

## II.   Procedural Background

Plaintiff filed the Complaint in federal court, based on federal question jurisdiction and jurisdiction under the Class Action Fairness Act, on May 26, 2023. (*See* Compl. at 35.)  On August 21, 2023, Finicity filed its present Motion to Compel Arbitration (ECF No. 17) and Motion to Change Venue or Dismiss (ECF No. 19).  (*See* Finicity's Mem. of P. and A. in Supp. of Mot. to Compel Arbitration (ECF No. 18) ("Arbitration Motion" or "Arb. Mot."); Finicity's Mem. of P. and A. in Supp. of Mot. to Transfer Venue Or, in the Alternative, Dismiss Compl. (ECF No. 20) ("Motion" or "MTD").)  Finicity also filed an unopposed Request for Judicial Notice (ECF No. 23), which the Court GRANTS.[2]  Plaintiff filed an Omnibus Opposition, and Finicity filed separate Replies.  (*See* Omnibus Opp'n to Finicity's Arb. Mot. and MTD (ECF No. 29) ("Opposition" or "Opp'n"); Finicity's Reply Mem. of P. and A. in Further Supp. of Arb. Mot. (ECF No. 30) ("Arbitration Reply" or "Arb. Reply"); Finicity's Reply Mem. of P. and A. in Further Supp. of MTD (ECF No. 31) ("Reply" or "MTD Reply").)  The Court heard oral arguments on November 9, 2023, where Attorneys Stefan Bogdanovich and

---

[2] The Court grants Finicity's Request for Judicial Notice in Support of Finicity's Motion (ECF No. 23) and takes judicial notice of Exhibits A, B, C, D, and E (*see* ECF Nos. 21-1, 21-2, 21-3, 21-4, and 21-5), which contain Finicity's End User License Agreement (its Terms and Conditions) revised as of November 18, 2019 (ECF No. 21-1), and Finicity's Privacy Notices (its Privacy Policy) from February 19, 2020 (ECF No. 21-5) through August 16, 2023 (ECF No. 21-2).  The Court grants Finicity's Request for Judicial Notice because: (1) these agreements are not subject to reasonable dispute, as both parties rely on them, and the contents of the notices are capable of being accurately and readily determined from online sources whose accuracy cannot reasonably be questioned, *see* Fed. R. Evid. 201(b)(2); and (2) the agreements are like an agreement that governs the private relations of the parties, *see*, *e.g.*, *Correa v. A2 Railla Dev., Inc.*, No. 2:22-cv-071280-DWP-DX, 2023 WL 6783987, at *2 (C.D. Cal. Apr. 7, 2023) (taking judicial notice of a collective bargaining agreement and collecting cases); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 876 (N.D. Cal. 2018) (taking judicial notice of the Terms of Service and other online contractual agreements), *aff'd*, 816 F. App'x 68 (9th Cir. 2020).  However, so as to not create an unassailable fact for the future, the Court will incorporate these documents by reference and will presume their veracity at this stage.  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018).  (*See, e.g.*, Compl. ¶ 8 ("A link to Finicity's privacy policy or terms of use does not appear anywhere on the fake login screen it designs."); *id.* ¶ 30 and nn.34–35 (citing and quoting Finicity's Privacy Policy); *id.* ¶ 34.)

1  Brittany S. Scott appeared for Plaintiff, and Attorneys Christopher G. Karagheuzoff,

2  Maral Shoaei, and Rachel P. Stoian appeared for Finicity. (*See* ECF No. 35.)  Both

3  parties filed supplemental authorities regarding the Arbitration Motion. (*See* ECF

4  Nos. 34, 36.)  The matter is now fully briefed.

5  **DISCUSSION**

6  **I.      Article III Standing and the Rule 12(b)(1) Motion**

7  **A.      The Court Construes the Motion as Raising a Facial Attack**

8          A Rule 12(b)(1) jurisdictional attack may be facial or factual.  *Safe Air for*

9  *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("*SAFE*") (citing *White v. Lee*,

10  227 F.3d 1214, 1242 (9th Cir. 2000)).  In a facial attack, the challenger takes the

11  allegations in the complaint as true but challenges whether those allegations are

12  sufficient to invoke jurisdiction.  *See id.* at 1039.  By contrast, in a factual attack, the

13  challenger disputes the truth of the allegations that, by themselves, would otherwise

14  invoke federal jurisdiction.  *Id.*  The difference is crucial because a court errs when it

15  considers evidence outside of the pleadings in a facial attack.  *See, e.g.*, *Salter v.*

16  *Quality Carriers, Inc.*, 974 F.3d 959, 964–65 (9th Cir. 2020) (vacating and remanding

17  the district court's order that construed an attack as factual rather than facial, thus

18  applying the wrong standard).  "For a facial attack, the court, accepting the allegations

19  as true and drawing all reasonable inferences in the [opponent's] favor, 'determines

20  whether the allegations are sufficient as a legal matter to invoke the court's

21  jurisdiction.'"  *Salter*, 974 F.3d at 964 (citation omitted).  However, "[w]hen a factual

22  attack is mounted, the responding party 'must support her jurisdictional allegations

23  with "competent proof" . . . under the same evidentiary standard that governs in the

24  summary judgment context.'"  *Id.* (citations omitted).

25          Finicity argues that "Plaintiff has not pled sufficient facts to satisfy [her] burden,

26  so all of her claims must be dismissed." (Mot. at 12.)  Thus, the Court concludes that

27  Finicity brings a facial attack because Finicity does not challenge the truthfulness of

28  Plaintiff's allegations, instead challenging their sufficiency.  *See Salter*, 974 F.3d at 964.

6

1

**B.      Plaintiff Adequately Pleads an Injury-in-Fact under CAPA and the UCSPA's Targeted Solicitations Ban**

2

3

**1.      Legal Standard**

4      The "irreducible constitutional minimum of standing" contains three elements:

5    (1) injury-in-fact; (2) causation; and (3) redressability. *Newdow v. Lefevre*, 598 F.3d

6    638, 642 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

7    (1992).  First, the plaintiff must have suffered an injury-in-fact: an invasion of a legally

8    protected interest which is (a) concrete and particularized, and (b) "actual or

9    imminent, not 'conjectural' or 'hypothetical[.]'" *Lujan*, 504 U.S. at 560 (citations

10   omitted).  Second, there must be a causal connection between the injury and the

11   conduct complained of: the injury has to be "fairly . . . trace[able] to the challenged

12   action of the defendant, and not . . . th[e] result [of] the independent action of some

13   third party not before the court." *Id.* at 560–61 (citation omitted).  Third, it must be

14   "likely," as opposed to merely "speculative," that the injury will be "redressed by a

15   favorable decision." *Id.* at 561 (citation omitted).  Because Plaintiff seeks injunctive,

16   that is, prospective, relief (*see* Compl. ¶¶ 10, 72, 113), Plaintiff must also show more

17   than a past exposure to illegal conduct, and must show that she suffers from the

18   "continuing, present adverse effects[,]" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

19   (1983) ("*Lyons*") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)), or that

20   future harm is "certainly impending" or that there is a "substantial risk" that such harm

21   will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 and n.5 (2013) (quoting

22   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 (2010)).  Where, as here, a

23   case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating"

24   each element.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("*Spokeo II*").

25      At base, Article III standing requires the plaintiff "[t]o demonstrate their

26   personal stake [in the case and] be able to sufficiently answer the question: What's it

27   to you?" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting Antonin Scalia,

28   *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17

7

1  Suffolk U. L. Rev. 881, 882 (1983)) (internal quotation marks omitted).  Typically,

2  plaintiffs demonstrate their personal stake through a "concrete" injury that "actually

3  exist[s]."  *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023)

4  (quoting *Spokeo II*, 578 U.S. at 340).  Tangible injuries, like physical harms or monetary

5  losses, are concrete.  *Id*.  But "[a] concrete injury need not be tangible."  *Id.* (quoting

6  *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1270 (9th Cir. 2019)).  Moreover, a legislature

7  may enact laws that protect substantive interests, a violation of which may constitute

8  an injury-in-fact.  Both the Supreme Court and the Ninth Circuit have recognized that

9  legislatures are "well positioned to identify [tangible and] intangible harms that meet

10  minimum Article III requirements."  *Spokeo II*, 578 U.S. at 341; *see TransUnion LLC*,

11  594 U.S. at 462 (Kagan, J., dissenting).  In cases involving a legislatively identified

12  harm, both courts counsel that "it is instructive to consider whether an alleged

13  intangible harm has a close relationship to a harm that has traditionally been regarded

14  as providing a basis for a lawsuit in English or American courts[,]" such as common law

15  torts or certain constitutional violations.  *Spokeo II*, 578 U.S. at 341 (citing *Vermont*

16  *Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)); *Phillips*, 74

17  F.4th at 991.

18         **2.    Analysis**

19             **a.    The Loss of Indemnification Rights and to the Value of**
20                     **Plaintiff's Data Are Too Speculative to Confer Standing**

21         Plaintiff's first alleged harm – the loss of indemnification rights (*see* Compl.

22  ¶¶ 49–52) – is insufficient to confer standing.  The identified harm is contingent upon

23  "a rogue actor at the Defendant us[ing] a consumers' credentials to access and

24  improperly transfer funds from their accounts . . . ."  (*Id.* ¶ 50; *see id.* ¶ 51).  But Plaintiff

25  has failed to identify any "rogue actor," and the Supreme Court has never held "that

26  the mere risk of future harm, without more, suffices to demonstrate Article III standing

27  in a suit for damages."  *TransUnion LLC*, 594 U.S. at 437.  So too with Plaintiff's third

28  alleged harm, the increased risk of identity theft.  (*See* Compl. ¶¶ 58–60).  Plaintiff fails

1    to allege that there ever *was* a breach or that she *was* ever targeted by a third party

2    because of Finicity's scheme.  (*Compare with* MTD at 14–15 (collecting cases).)  Thus,

3    even though Plaintiff has spent time and money to monitor her credit and identity, she

4    "cannot manufacture standing by incurring costs in anticipation of non-imminent

5    harm."  *Clapper*, 568 U.S. at 422.

6         Plaintiff's second alleged harm revolves around the notion that Finicity's

7    financial data aggregation crowds out Plaintiff's ability to market and sell her

8    information and data.  (*See* Compl. ¶¶ 53–57.)  Plaintiff claims that "there is an

9    economic value to the financial data that Finicity collects, analyzes, and sells about

10   Plaintiff and Class members."  (*Id.* ¶ 53.)  True enough, but Plaintiff again fails to

11   specifically allege a pocketbook or economic injury *to herself* in the form of lost

12   money or property.  Plaintiff complains that "Finicity's unlawful conduct is a substantial

13   factor preventing the developing a market for Plaintiff and class members to sell

14   access to their data on their terms."  (*Id.* ¶ 55.)  A market requires demand, however,

15   which assumes that there is at least someone able and willing to pay.  Yet Plaintiff fails

16   to allege that she or any other putative class members *did* try to sell their individual

17   data and were unable to complete a sale.  (*Compare with* MTD at 14 (collecting

18   cases).)  If the presence of "'some day' intentions–without any description of concrete

19   plans, or indeed any specification of *when* the some day will be–do not support a

20   finding of the 'actual or imminent' injury that our cases require[,]" then the absence of

21   any stated "some day" intentions to sell one's information and data is also fatal to

22   Plaintiff's argument here.  *See Lujan*, 504 U.S. at 564.

23                    **b.    The Statutes Protect Concrete Interests**

24        Perhaps recognizing the Complaint's deficiencies, Plaintiff raises a new theory

25   of standing in her Opposition based on privacy interests purportedly protected by the

26   statutory claims she brings.  (*See* Opp'n at 20–21 (citing Compl. ¶¶ 3–5, 9, 15, 19–21,

27   41, 46).)  Finicity objects to this argument, pointing out that privacy is not mentioned

28   in the Complaint and that there is no claim for an invasion of privacy.  (*See* MTD Reply

at 4.)  Even if this case is ultimately about a direct injury to Plaintiff's privacy rights and right to control her personal information, *see, e.g.*, *Patel*, 932 F.3d at 1273 (quoting *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989) (recognizing the common law's protection of a privacy right)), the question for this Court is whether the statutes that provide a cause of action either (1) protect a substantive right, the invasion of which is an injury that confers standing, or (2) establish a procedural right, the violation of which creates a material risk of harm sufficient to confer standing.  *See Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 782 (9th Cir. 2018) (first quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982–84 (9th Cir. 2017); and then citing *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114–17 (9th Cir. 2017) ("*Spokeo III*")).

### i.    The Statutes Do Not Codify Privacy Rights

The Ninth Circuit has recognized that "the distinction between a 'substantive' statutory violation that alone creates standing, and a 'procedural' statutory violation that may cause harm or a material risk of harm sufficient for standing[ ] can be a murky one."  *Bassett*, 883 F.3d at 782 n.2.  Nonetheless, the Ninth Circuit has explained that a court "must always analyze whether the alleged harm is concrete, with an eye toward history and congressional judgment . . . ."  *Id.*

Here, Plaintiff tries to tie her Article III standing to her privacy rights in the personal information Finicity obtains and to a somewhat similar case from the Northern District of California, *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461 (N.D. Cal. 2021).  (*See* Opp'n at 21–22.)  In *Cottle*, the plaintiffs alleged a cause of action under several privacy-related statutes and CAPA, and the court held that the plaintiffs established Article III standing "because each of their claims relate[d] to [the defendant's] alleged invasion of their privacy rights."  *Cottle*, 536 F. Supp. 3d at 480. However, as Finicity points out, *Cottle* involved statutory causes of action that courts had already found to protect substantive privacy rights (*see* MTD Reply at 6 and n.5 (collecting cases)), and the court in *Cottle* did not specifically analyze whether CAPA

1  protected a substantive privacy right or created a procedural right that protects

2  against a material risk of harm (*see id.* at 6–7 and n.7).  Therefore, *Cottle* is of little

3  help.

4      Turning to the question before the Court of whether CAPA or the UCSPA's

5  Targeted Solicitations Ban protect concrete interests sufficient to confer Article III

6  standing, the Ninth Circuit has established a two-part test that "asks '(1) whether the

7  statutory provisions at issue were established to protect [the plaintiff's] concrete

8  interests (as opposed to purely procedural rights), and if so, (2) whether the specific

9  procedural violations alleged in this case actually harm, or present a material risk of

10  harm to, such interests.'"  *Patel*, 932 F.3d at 1270–71 (quoting *Spokeo III*, 867 F.3d at

11  1113).  The statutes at issue here, CAPA and the UCSPA's Targeted Solicitations Ban,

12  function similarly and the analysis substantially overlaps between the two.  CAPA

13  makes it "unlawful for any person, by means of a Web page, electronic mail message

14  or otherwise through use of the Internet, to solicit, request, or take any action to

15  induce another person to provide identifying information by representing itself to be a

16  business without the authority or approval of the business."  Cal. Bus. & Prof. Code

17  § 22948.2.  The UCSPA's Targeted Solicitations Ban similarly makes it unlawful for a

18  supplier[3] "who is not the financial institution of an account holder [to] represent,

19  directly or indirectly, that the supplier is the financial institution of the account

20  holder[,]" Utah Code Ann. § 13-11-4.1(4), and makes it unlawful to engage in

21  "targeted solicitation," which means:

22      any written or oral advertisement or solicitation for products
       or services that: (i) is addressed to an account holder;
23      (ii) contains specific account information; (iii) is offered by a
       supplier that is not sponsored by or affiliated with the
24      financial institution that holds the account holder's account;
       and (iv) is not authorized by the financial institution that
25      holds the account holder's account.

26

27  [3] A "supplier" under the UCSPA "means a seller, lessor, assignor, offeror, broker, or other person who
    regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with
28  the consumer."  Utah Code Ann. § 13-11-3(6).

1  *Id.* § 13-11-4.1(1)(d).

2    As for the first part of the test stated above, the two statutes do not protect

3  privacy rights.  Plaintiff's reliance on the Second Restatement of Torts, the common-

4  law tort of intrusion upon seclusion, and Ninth Circuit cases finding Article III standing

5  under a statute that protected a substantive privacy right are unavailing here because

6  it is not clear that either the California or Utah Legislatures intended to protect privacy

7  rights in the passage of CAPA and the UCSPA's Targeted Solicitations Ban.  *Compare*

8  *with Eichenberger*, 876 F.3d at 983 (finding standing where the statute at-issue, 18

9  U.S.C. § 2710(b)(1), provided that "[a] video tape service provider who knowingly

10  discloses, to any person, personally identifiable information concerning any consumer

11  of such provider shall be liable to the aggrieved person . . . ."); *Van Patten v. Vertical*

12  *Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (finding standing under the

13  Telephone Consumer Protection Act of 1991, where "Congress made specific findings

14  that 'unrestricted telemarketing can be an intrusive invasion of privacy' and are a

15  'nuisance.'").

16    CAPA protects "identifying information," which "means, with respect to an

17  individual any of the following:"

18      (1) Social security number.  (2) Driver's license number.
    (3) Bank account number.  (4) Credit card or debit card

19      number.  (5) Personal identification number (PIN).
    (6) Automated or electronic signature.  (7) Unique biometric

20      data.  (8) Account password.  (9) Any other piece of
    information that can be used to access an individual's

21      financial accounts or to obtains goods or services.

22  Cal. Bus. & Prof. Code § 22948.1(b).  The UCSPA's Targeted Solicitations Ban protects

23  "specific account information," which "includes: (A) a loan number; (B) a loan amount;

24  or (C) any other specific account or loan information."  Utah Code Ann. § 13-11-

25  4.1(1)(c)(ii).  Aside from the exceptional reference to "unique biometric data" in CAPA,

26  much of the information covered by the two statutes is information that is maintained

27  by an entity providing a good or service for the individual and that is required to be

28  disclosed in certain circumstances (like the social security number, the driver's license

number, the bank account number, the credit card or debit card number, and the loan number) and, as held by the Ninth Circuit, is not "so sensitive that another's access to that information 'would be highly offensive to a reasonable person' or otherwise gives rise to reputational harm or injury to privacy interests." *Phillips*, 74 F.4th at 996 (quoting *Restatement (Second) of Torts* § 625B (Am. L. Inst. 1977)). *Compare with id.* (discussing "names, birthdays, social security numbers, occupations, addresses, social medica profiles, and political views and associations"); *Patel*, 932 F.3d at 1268–69 (holding that a plaintiff had standing under an Illinois law "regulating the collection, use, safeguarding, and storage of biometrics[,]" including "biometric identifiers" such as a "scan of hand or face geometry."). Crucially, as stated in CAPA, the information covered includes "any other piece of information that *can be used to access an individual's financial accounts*[,]" Cal. Bus. & Prof. Code § 22948.1(b)(9) (emphasis added), so the violation is for the unauthorized access to and acquiring of this information, *not* the unauthorized *investigation or intrusion* upon an individual's financial accounts. A potential injury to privacy under these statutes is therefore dependent upon additional consequences to be actionable, unlike common-law privacy torts, as the mere acquisition of this information does not necessarily violate a person's privacy or intrude upon their seclusion. *Compare with Patel*, 932 F.3d at 1274 (noting that, "[u]nder the common law, an intrusion into privacy rights by itself makes a defendant subject to liability[,]" citing *Restatement (Second) of Torts* § 625(B), and that "privacy torts do not always require additional consequences to be actionable[,]"quoting *Eichenberger*, 876 F.3d at 983).

Looking to the records available for the enacting State Legislatures confirms the conclusion that CAPA and the UCSPA's Targeted Solicitations Ban do not "codif[y] a context-specific extension of the *substantive* right to privacy[.]" *Eichenberger*, 876 F.3d at 983. For instance, CAPA grounded itself in the common law action of *fraud*, not invasion of privacy. *See Bill Analysis: Senate Floor Analyses on S.B. 355 Before the S. R. Comm.*, 2005–06 Reg. Sess., at 2 (Cal. 2005) ("CAPA's Second Senate Floor

1    Analyses”),

2    https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=200520060SB

3    355 [Perma.cc record: https://perma.cc/FF3M-79BR].  Similarly, the UCSPA's Targeted

4    Solicitations Ban is also focused on preventing fraud with the enrolled copy of the bill

5    providing that it “enacts provisions in the Utah Consumer Sales Practices Act and the

6    Financial Transaction Card Protection Act[ ]” that, in relevant part, “prohibits a supplier

7    who is not the financial institution of an account holder from representing that the

8    supplier is the financial institution of the account holder[.]”  Consumer Sales Practices

9    Amendments, H.B. 113, at 1, 63d Leg., Gen. Sess., 2020 Utah Laws Ch. 173 (enacted),

10   https://le.utah.gov/~2020/bills/static/HB0113.html [Perma.cc record:

11   https://perma.cc/PM2L-NXQGT].  Further revealing that these statutes are not about

12   privacy is that other laws contemplated by the same State Legislatures were *explicitly*

13   about privacy.[4]  Thus, the statutes do not protect substantive privacy rights.  *See*

14   *Spokeo III*, 867 F.3d at 1113 (citation omitted).

15

16   _____

17   [4] *See* Internet – Anti-Phishing Act, 2005 Cal. Legis. Serv. Ch. 437 (S.B. 355) (West) (noting that “the
     Consumer Protection Against Computer Spyware Act[ ] provides specified protections for the
18   computers of consumers in this state against certain types of computer software.”),
     https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200520060SB355 [Perma.cc
19   Record: https://perma.cc/QM34-5M4T]; *Bill Analysis: Hearing on S.B. 1436 Before the Sen. Jud. Comm.*,
     2003–04 Reg. Sess., at 1–2 (Cal. 2004) (noting that existing law, including the California Constitution and
20   common law, recognize the right to privacy, and that the common law tort of trespass to chattels has
     been applied to computer systems),
21   https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=200320040SB1436 [Perma.cc
     Record: https://perma.cc/95ZA-385U]; Electronic Information and Data Privacy Amendments, H.B. 383,
22   at 1, 63d Leg., Gen. Sess. (Utah 2020) (proposing amendments that were filed in the Utah House but
     not passed in the Utah Senate that “related to the privacy of electronic data and information.”),
23   https://le.utah.gov/~2020/bills/static/HB0383.html [Perma.cc Record: https://perma.cc/6ZKS-BJXK];
     Electronic Information and Data Privacy Amendments, H.B. 87, at 1, 64th Leg., Gen. Sess., 2021 Utah
24   Laws Ch. 42 (enacting amendments similar to those proposed in H.B. 383 “related to the privacy of
     electronic data and information.”), https://le.utah.gov/~2021/bills/static/HB0087.html [Perma.cc
25   Record: https://perma.cc/7WWE-VDDT]; Utah Consumer Privacy Act, S.B. 249, at 1, 63d Leg., Gen.
     Sess. (Utah 2020) (proposing amendments that were filed in the Utah Senate but did not pass in the
26   Utah Senate that would “create[ ] a cause of action for . . . the consumer to recover damages . . . from a
     business if the business fails to disclose personal information collected or sold, to delete personal
27   information upon the consumer's request, or to stop selling a consumer's personal information upon
     request[ ]”), https://le.utah.gov/~2020/bills/static/SB0249.html [Perma.cc Record:
28   https://perma.cc/ZV8T-RHSZ].

1

### ii.    The Statutes' Procedural Rights Prevent Fraud

2    While CAPA and the UCSPA's Targeted Solicitations Ban do not protect privacy

3    interests, they do protect another interest that has a common-law analogue and that is

4    raised by Plaintiff in the Complaint: the prevention of fraud, thus satisfying the first

5    part of the Ninth Circuit's test.[5]  *See, e.g.*, CAPA's Second Senate Floor Analyses, at 3

6    ("Phishing is a widespread technique for obtaining personal information and is used

7    to facilitate identity theft and other crimes."); Utah Code Ann. § 13-11-4.1(1)(d), (3)–(4)

8    (making it unlawful as a deceptive act or practice for a supplier to make a targeted

9    solicitation using specific account information without a disclosure only if the sender

10   of the targeted solicitation is not affiliated or associated with the target's financial

11   institution).

12   However, to satisfy the second part of the Ninth Circuit's test, the Court must

13   still find that "the specific procedural violations alleged in this case actually harm, or

14   present a material risk of harm to, such interests."  *Spokeo III*, 867 F.3d at 1113; *see*

15   *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1066 (D.C. Cir. 2019).  Like the D.C.

16   Circuit finding a concrete injury-in-fact under the Fair and Accurate Credit

17   Transactions Act of 2003 ("FACTA"), codified at 15 U.S.C. § 1681c(g), and other courts

18   under similar laws enacting procedural protections,[6] CAPA and the UCSPA's Targeted

---

19
20   [5] While Plaintiff did not explicitly argue or allege that CAPA and the UCSPA's Targeted Solicitations Ban establish a concrete injury-in-fact sounding in fraud, rather than privacy, as the Court concludes, it is appropriate for the Court to consider this basis for Article III standing because Plaintiff did allege fraud

21   or deceit generally.  (*See* Compl. ¶¶ 1-4, 8, 15, 24-34, 55, 57, 60-61, 99-100, 106, 111.)  Moreover, courts have an independent obligation to determine whether subject-matter jurisdiction exists, even in

22   the absence of a challenge from any party.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)).  And when a federal court has jurisdiction, it

23   also has a "virtually unflagging obligation . . . to exercise" that authority.  *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))

24   (omission added in *Mata*).

25   [6] *See also Strubel v. Comenity Bank*, 842 F.3d 181, 190-91 (2d Cir. 2016) (holding that the plaintiff had standing under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, for procedural violations of the

26   statute's right to the informed use of credit where "[t]hese procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's

27   own actions can affect his rights with respect to credit transactions[,]" and the defendant failed to follow certain disclosure requirements that could have led to missed payments or increased charges); *Spokeo*

28   *III*, 867 F.3d at 1115-17 (holding that the plaintiff had standing under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, because the "procedures at issue in this case were crafted to protect

1    Solicitations Ban themselves "do[ ] not prohibit the crime of identity theft; instead,

2    [they] establish[ ] a procedural requirement to ensure that consumers can use their

3    credit and debit cards without incurring *an increased risk* of identity theft [and fraud]."

4    *Jeffries*, 928 F.3d at 1066.  For instance, California recognized that one argument in

5    support of passing CAPA was to instill "[c]onfidence in the integrity of personal

6    information transmitted via the Internet [that] remains an integral part of the medium's

7    development."  CAPA's Second Senate Floor Analyses, at 5.

8         Nonetheless, as the Supreme Court has now clarified: "No concrete harm, no

9    standing." *TransUnion LLC*, 594 U.S. at 442.  Here, however, Plaintiff has alleged two

10   sufficiently concrete harms from the past to pursue monetary relief that, while

11   insufficient to support traditional Article III standing on their own, constitute sufficient

12   harm arising from the alleged statutory violations to provide standing.

13        First, Plaintiff alleged that the risk of future harm has materialized in the form of

14   the expenses she has paid for "ongoing costly credit monitoring services."  (Compl.

15   ¶ 59.)  A personal pocketbook injury has always been enough for Article III standing

16   purposes, even if just a few pennies or a "trifle."  *United States v. Students Challenging*

17   *Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (quoting Kenneth C.

18   Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613 (1968)); *see, e.g.*,

19   *Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) ("Any monetary loss, even one as

20   small as a fraction of a cent, is sufficient to support standing.").

21        Second, Plaintiff alleges that Finicity has shared her personal financial

22   information and financial data with others, alleging that, as a result, "Finicity has

23   multiplied the number of targets for malicious actors[ ] [because] [i]t is hard to keep a

24   password secret between just two people[,] [and] [i]t is even harder to keep it secret

25   _____

26   consumers' . . . concrete interest in accurate credit reporting about themselves[,]" and the defendant
     had disclosed such inaccurate information, thus implicating the statutory right; *Tailford v. Experian Info.*
27   *Sols., Inc.*, 26 F.4th 1092, 1099–1100 (9th Cir. 2022) (holding that the plaintiff had standing under the
     Fair Credit Reporting Act where "alleged procedural violations protected substantive rights by
     requiring disclosures necessary for informed decision-making."  (citing *Syed v. M-I, LLC*, 853 F.3d 492,
28   497–99 (9th Cir. 2017))).

with three or more people." (Compl. ¶ 58.)  Finicity's own User Agreement contained

in its hyperlinked Terms and Conditions confirms that users like Plaintiff:

> are authorizing Finicity to, among other things, (i) collect
> your Consumer Credentials and Uploaded Data, (ii) instruct
> Provider on your behalf to provide your Provider Account
> Data to Finicity in order to provide Services to you (either
> using your Consumer Credentials or through other means
> with your Provider); (iii) retain and use, at least two times for
> no less than a sixty (60) day period, your Consumer
> Credentials for the provision of the Services; (iv) access,
> retain, and use your Consumer Data in providing you
> Services, at least two times for no less than a sixty (60) day
> period; (v) compare Provider Account Data and Uploaded
> Data in providing you Services, and/or (vi) disclose and
> share your Consumer Data to service providers and/or
> resellers to use in accordance with applicable law and for
> research and development.

(ECF No. 21-1 at 3.)

In addition to retaining Plaintiff's financial information for itself, Finicity also

discloses it to "third party affiliates."  Specifically, the User Agreement states:

> You acknowledge that in accessing your data and
> information through the Services, your Provider account
> access number(s), password(s), security question(s) and
> answer(s), account number(s), login information, and any
> other security or access information, and the actual data in
> your account(s) with such Provider(s) such as bank and
> other account balances, credit card charges, debits and
> deposits (collectively, "Provider Account Data"), may be
> collected and stored in Services.  You further acknowledge
> that in providing or uploading your financial and/or
> employment documents, statements, records, or other
> information (either directly to Finicity or through a third-
> party) ("Uploaded Data"), such Uploaded Data will be
> stored and used in the Services.  Provider Account Data and
> Uploaded Data are referred to collectively herein as
> "Consumer Data".  You authorize us and our third party
> affiliates, in conjunction with the operation and hosting of
> the Services, to use certain Consumer Data to (a) collect
> your Consumer Data, (b) reformat and manipulate such
> Consumer Data, (c) create and provide hypertext links to
> your Provider(s), (d) access Providers' websites using your
> Consumer Data, (e) update and maintain your account
> information, (f) address errors or service interruptions,
> (g) enhance the type of data and services we can provide to
> you in the future, and (h) take such other actions as are
> reasonably necessary to perform the actions described in
> (a) through (g) above.  You hereby represent that you are
> the legal owner of your Consumer Data and that you have
> the authority to appoint, and hereby expressly do appoint

us or our third-party affiliates as your attorney-in-fact and agent, to access third-party sites and/or retrieve your Consumer Data through whatever lawful means with the full power and authority to do and perform each thing necessary in connection with such activities, as you could do in person, without limitation, accepting any new and/or updated Terms and Conditions from your Provider on your behalf, in providing Services to you.  You also expressly authorize Provider to share and disclose your Provider Account Data to us on your behalf to facilitate your use of your Provider Account Data for products and services agreed to by you.

(ECF No. 21-1 at 3–4.)  Thus, this case involves more than the mere retention of information unlawfully obtained.  *Compare with Phillips*, 74 F.4th at 996.  As a result, Plaintiff has pled facts establishing a concrete harm that has materialized from these statutory violations.  *See TransUnion LLC*, 594 U.S. at 425.

Furthermore, this is not a case where the risk of fraud or identity theft is minimal because of the information involved.[7]  The Complaint alleges that Finicity has information from which "Finicity can '[a]ugment credit reports with real-time data for better credit decisioning of customers considered to be subprime,' such as 'cash flow analytics' and 'income verification[,]'" (Compl. ¶ 20 (quoting Finicity's website)), and its "profiling of people is so comprehensive they include attributes like [an individual's] 'TV and Streaming Services.'" (*Id.* ¶ 4.)  That is, the information Finicity allegedly has access to is enough to defraud Plaintiff.  *See Jeffries*, 928 F.3d at 1067 ("Because the receipt contained enough information to defraud Jeffries, she suffered an injury in fact at the point of sale.").  And unlike other cases where the plaintiff could take actions to prevent the fraud, Plaintiff cannot do so here because Finicity, not Plaintiff, gave away to others the information that can be used to access Plaintiff's financial accounts.

---

[7] Indeed, as the Complaint alleges, and Finicity's Terms and Conditions and Privacy Policy confirm, Plaintiff's individual data is "s[old] as part of large compilations of individual transactions that remain traceable to particular individuals." (Compl. ¶ 18; *see also* ECF No. 21-1 at 4 (discussing Finicity's use of "compiled, anonymized data concerning your financial transactions, or other available data that is collected through your use of the Services[ ]"); ECF No. 21-2 at 6 ("We may use, share, or publicly disclose or otherwise process your information that has been, de-identified, anonymized and/or aggregated (so that it does not identify you personally) for any purpose permitted under applicable law, including for research and the development of new products.").)

Thus, Finicity, not Plaintiff, is the best-situated person to regain control of that information.  *Compare with Bassett*, 883 F.3d at 783 (finding no injury-in-fact where the plaintiff failed to allege "any risk of harm is real, 'not conjectural or hypothetical,' given that he could shred the offending receipt along with any remaining risk of disclosure."); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (finding no injury-in-fact for a Fair and Accurate Credit Transactions Act violation because "[i]f his receipt would not offer any advantage to identity thieves, we could hardly say that he was injured because of the efforts he took to keep it out of their hands.").

Finicity finally argues that Plaintiff has a redressability problem, that is, Finicity argues that Plaintiff cannot show how the relief she seeks will remedy her alleged injuries.  (*See* MTD Reply at 7.)  Plaintiff seeks monetary relief, and a decision in her favor would compensate her lost money paying for credit monitoring services.  These costs may fairly be attributed to Finicity because "in procedural-standing cases, we tolerate uncertainty over whether observing certain procedures would have led to (caused) a different substantive outcome[.]"  *Dep't of Educ. v. Brown*, 600 U.S. 551, 565–66 (2023) (citing *Lujan*, 504 U.S. at 572 n.7)

Moreover, Legislatures are "well positioned to identify intangible harms that meet Article III requirements . . . ."  *Spokeo II*, 578 U.S. at 341.  Legislatures "ha[ve] the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before," so long as the Legislature "at the very least identif[ies] the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit."  *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in judgment).

Here, for example, California found when passing CAPA that the fraudulent practice it targeted, called "phishing," had 78% of its perpetrators located in the United States, with 15% of the scams originating in California, the most in the nation.  *See* CAPA's Second Senate Floor Analyses, at 4.  California also found that these

1   scams cost 76,000 consumers to lose money based on more than 100,000 reports of

2   fraud, totaling over $193 million in losses in 2003 and 2004 alone, the year before

3   CAPA was passed.  *See id*.  These findings are entitled to deference from courts,

4   which should only override the Legislature's decision to provide a cause of action if

5   the Legislature "could not reasonably have thought a suit will contribute to

6   compensating or preventing the harm at issue."  *TransUnion LLC*, 594 U.S. at 463

7   (Kagan, J., dissenting); *see, e.g.*, *Spokeo III*, 867 F.3d at 1115 (recognizing standing

8   despite some differences between the statutory cause of action and the comparable

9   common-law cause of action because courts "respect Congress's judgment that a

10  similar harm would result from [the prohibited conduct].").  Here, Plaintiff's complaints

11  plainly fall within the scope of both statutes.

12          As for the "continuing, adverse effects" required to seek prospective relief,

13  *Lyons*, 461 U.S. at 102 (quoting *O'Shea*, 414 U.S. at 493), the Court finds that there are

14  two.  First, as explained above, there is a "substantial risk" that fraud or identity theft

15  will occur based on violations of CAPA and the UCSPA's Targeted Solicitations Ban.

16  *Clapper*, 568 U.S. at 414 n.5 (citations omitted).  Second, Plaintiff suffers the

17  "continuing, present adverse effects[ ]" of losing control over her information after

18  giving it to Finicity as a result of Finicity's allegedly fraudulent conduct.  *See*

19  *Eichenberger*, 876 F.3d at 983.  These harms are traceable to Finicity because of its

20  alleged violations of CAPA and the UCSPA's Targeted Solicitations Ban.  Finally, a

21  decision in Plaintiff's favor would be likely to remedy Plaintiff's loss because an

22  injunction could compel Finicity to regain control of Plaintiff's information.  As stated

23  before, Finicity – not Plaintiff – is the best-situated problem-solver, as Finicity could go

24  up and down its supply and service chain to ask for Plaintiff's information to be

25  returned and deleted from its "third part affiliates."  Thus, Plaintiff has established

26  Article III standing to pursue monetary and injunctive relief under CAPA and the

27  UCSPA's Targeted Solicitations Ban.

28  *////*

1    **c.    Plaintiff's RICO Claim Is Too Speculative**

2        **i.    Plaintiff Lacks Article III Standing to Pursue Her
3              RICO Claim**

4        The Court concludes that Plaintiff has adequately pled an injury-in-fact because

5    of the alleged violations of CAPA and the UCSPA's Targeted Solicitations Ban.  But

6    standing is not dispensed in gross.  *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

7    Plaintiff's alleged pocketbook or market injury theory of standing is not sufficient to

8    establish Article III standing to pursue her RICO claim without any allegations that she

9    lost sales or suffered damage to her reputation or that she had preexisting potential

10   purchasers.  *Compare with Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572

11   U.S. 118, 125 (2014); *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397

12   U.S. 150, 152 (1970).  Accordingly, the Court dismisses the first cause of action

13   concerning RICO.

14       While Plaintiff may be able to amend her complaint to allege a chain of

15   inferences to establish her Article III standing to pursue her claim of lost sales or lost

16   profits without direct proof of diverted sales or business, *see, e.g.*, *TrafficSchool.com,

17   Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011), RICO standing is a more rigorous

18   matter than standing under Article III.  *Denney v. Deutsche Bank AG*, 443 F.3d 253,

19   266 (2d Cir. 2006); *see also TrafficSchool.com, Inc.*, 653 F.3d at 826 ("Evidence of

20   direct competition is strong proof that plaintiffs have a stake in the outcome of the

21   suit, so their injury isn't 'conjectural' or 'hypothetical.'" (quoting *Lujan*, 504 U.S. at

22   560)).  To provide guidance to Plaintiff in amending her claims and for purposes of

23   judicial economy, the Court proceedings to the question of whether Plaintiff has

24   statutory standing under RICO, which the Court answers in the negative.  Nonetheless,

25   the Court concludes that amendment would not be futile.  *See Foman v. Davis*, 371

26   U.S. 178, 182 (1962).

27   *////*

28   *////*

1

### ii.      Plaintiff Lacks Statutory Standing to Pursue Her RICO Claim

2

3       RICO provides a private cause of action for "[a]ny person injured in his business

4   or property by reason of a violation of [18 U.S.C. § 1962(c)]."  *United Bhd. of*

5   *Carpenters & Joiners of Am. v. Bldg. and Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834,

6   837 (9th Cir. 2014) (quoting 18 U.S.C. § 1964(c)).  Subsections 1962(a) through (c)

7   prohibit certain "pattern[s] of racketeering activity" in relation to an "enterprise."  *Id.*

8   Subsection 1964(d) makes it illegal to conspire to violate subsections (a), (b), and (c) of

9   section 1962.  *Id.*

10      A *prima facie* RICO claim requires the plaintiff to assert: (1) conduct (2) of an

11  "enterprise" (3) through a "pattern" (4) of "racketeering activity" (known as "predicate

12  acts") that (5) cause injury to plaintiff's business or property.  *See, e.g.*, *id.* (quoting

13  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)

14  (citations omitted)).  Plaintiff alleges that Finicity, as the RICO enterprise,[8] engaged in a

15  pattern of racketeering activity consisting of "intentionally traffick[ing] in . . . services

16  and knowingly us[ing] a counterfeit mark . . . in connection with such . . services" in

17  violation of 18 U.S.C. § 2320, which is identified as a predicate act under

18  Section 1961(1), the section providing definitions under RICO.  (Compl. ¶ 81.)  Plaintiff

19  alleges that "Finicity has repeatedly violated 18 U.S.C. § 2320(a) by trafficking

20  counterfeit marks of financial institutions in connection with its bank account linking

21  services by using such counterfeit marks on fake login screens on various FinTech

22  apps, including, but not limited to, Every Dollar."  (*Id.* ¶ 82.)  Plaintiff provides nine

23  separate figures (Figures 10 through 18 of the Complaint) depicting what Plaintiff

24  alleges are counterfeit marks of several financial institutions that Finicity has used

25  without a license.  (*See id.* ¶¶ 35–36, 83–84, 86.)  Given the nature of the allegations,

26

27  ─────────────
[8] For a claim under 18 U.S.C. § 1962(a), it is permissible to name the same party as the RICO "person" and RICO "enterprise."  *See, e.g.*, *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 574 (9th Cir. 2004)
28  (citing *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992)).

1   Plaintiff has alleged a pattern of two or more distinct instances of counterfeiting

2   trademarks by Finicity, thus establishing a pattern of racketeering activity.  (*See id.*

3   ¶ 87.)  As for the injury to business or property, California law recognizes protections

4   for prospective business relations, a well-recognized injury to business or property for

5   RICO purposes.  *See Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*) (*per*

6   *curiam*) (applying California law); *Global Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76

7   F.4th 1266, 1274 (9th Cir. 2023) (citing *Diaz*, 420 F.3d at 900).  Therefore, Plaintiff has

8   established the *prima facie* elements to her RICO claim.  *See United Bhd. of*

9   *Carpenters & Joiners of Am.*, 770 F.3d at 837.

10          In addition to the *prima facie* elements identified above, however, Plaintiff must

11  also establish statutory standing to bring a § 1962(a) RICO claim, which requires that a

12  plaintiff "allege facts tending to show that he or she was injured by the use or

13  investment of racketeering income."  *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec.*

14  *Co.*, 981 F.2d 429, 437 (9th Cir. 1992).  The so-called "investment injury" requirement

15  arises from the Ninth Circuit's reading of the "plain language" of § 1962(a) and

16  § 1964(c) to not "allow an individual to recover for injuries caused by an action that

17  does not constitute a violation of section 1962(a) [because] section 1964(c) speaks not

18  of an 'element of a violation' but rather only of a 'violation.'"  *Id.*

19          For investment injury, Plaintiff essentially argues that Finicity acquired

20  "racketeering income" from trafficking in counterfeit trademarks for financial

21  institutions in the form of "data" and other investment insights that Finicity then sold to

22  create the "financial data aggregation" function of the RICO "enterprise" as an

23  "undisclosed second line of business[.]"  (Compl. ¶¶ 3, 18–19; *see* Opp'n at 24–26.)

24  But Plaintiff's investment injury fails for two reasons: first, as a matter of law, and

25  second, as a matter of fact or proximate cause.

26          First, the Court is unconvinced that RICO – broad as it may be – is broad

27  enough to stretch the word "income" to mean "data."  (*See* Opp'n at 24.)  While the

28  RICO statute is often interpreted broadly to "effectuate its remedial purposes," Title IX

23

1  of the Organized Crime Control Act of 1970 § 904(a), Pub. L. No. 91-452, 84 Stat. 947;

2  *see also, e.g., Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98 (1985), neither the

3  common understanding of income nor the dictionary definition of the word suggests

4  that it would encompass data.  *Black's Law Dictionary* (11th ed. 2019), for example,

5  defines income as "money or other form of payment that one receives," typically from

6  employment, business, or the like.  While it may be, as Plaintiff argues, that income

7  could include something like Bitcoin or stocks that are easily liquidated, raw data is

8  not so easily liquidated or transferred into cash to be understood as income.[9]

9       Second, Plaintiff does not allege how the RICO violation is a proximate cause of

10  any injury to her.  A civil RICO "plaintiff only has standing if, and can only recover to

11  the extent that, [s]he has been injured in h[er] business or property by the conduct

12  constituting the violation."  *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975

13  (9th Cir. 2008) (first quoting *Sedima, S.P.R.L.*, 473 U.S. at 496; and then citing 18 U.S.C.

14  § 1964(c)).  Federal courts interpret RICO's "by reason of" language and similar

15  language in other statutes to require proximate causation and "some degree of

16  directness."  *See, e.g.*, *Fields v. Twitter, Inc.*, 881 F.3d 739, 745 (9th Cir. 2018) (citing

17  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992), a RICO case, when interpreting

18  the Anti-Terrorism Act).

19       To have RICO standing, a plaintiff must therefore allege a "concrete financial

20  loss[,]" *Diaz*, 420 F.3d at 898 (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d

21  783, 785 (9th Cir. 1992) (*en banc*)), not a loss of personal rights or discomfort and

22  annoyance, *see id.* (quoting *Oscar*, 965 F.2d at 785).  The Ninth Circuit instructs courts

23

24  [9] The Court also notes that a United States House of Representatives Report on the Organized Crime
   Act, which contained the RICO act, defined a "substantial source of income" for a related section on
25  Dangerous Special Offenders, 18 U.S.C. §§ 3575–78, by reference to what a "workingman receives
   under the Fair Labor Standards Act."  H.R. Rep. No. 91-1549, at 61–62, *reprinted in* 1970 U.S.C.C.A.N.
26  4007, 4039.  Despite the ubiquity of data in the modern economy, data, by itself, is still not "income"
   that can supply a "workingman's" wages, and, therefore, cannot be said to fall within the scope of RICO
27  with sufficient "clarity and predictability" to support a criminal or civil violation.  *H.J. Inc. v. Nw. Bell Tel.
   Co.*, 492 U.S. 229, 255 (1989) (Scalia, J. concurring in the judgment) (citing *Fed. Commc'ns Comm'n v.
28  Am. Broad. Co.*, 347 U.S. 284, 296 (1954)).

1  to "typically look to state law to determine 'whether a particular interest amounts to

2  property[.]'"  *Id.* at 899 (quoting *Doe v. Roe*, 958 F.2d 763, 768 (7th Cir. 1992)).

3        For her RICO cause of action, Plaintiff essentially alleges a competitive injury,

4  that is, a harm to Plaintiff's ability to compete in the marketplace, arguing that Finicity

5  has caused Plaintiff to lose control over her financial data and information (*see* Opp'n

6  at 25; Compl. ¶ 90), and that "[b]y stealing Plaintiff and Class members' data without

7  their informed consent, Finicity impedes the possibility of a robust and equitable

8  market for consumer data where Plaintiff and Class members could be compensated."

9  (Compl. ¶ 57.)[10]  Plaintiff also alleges that Finicity's RICO activity injured her through

10  the increased risk of identity theft and ongoing costly credit monitoring services, but

11  these are more like the discomforts and annoyance found insufficient in *Diaz*.  *See* 420

12  F.3d at 898 (quoting *Oscar*, 965 F.2d at 785).

13        As for the competitive injury, Plaintiff fails to allege a "concrete financial loss."

14  *Diaz*, 420 F.3d at 898 (quoting *Oscar*, 965 F.2d at 785).  Critically, Plaintiff does not

15  allege that she tried to sell her data to a willing and able buyer but was boxed-out

16  because of Finicity's deal.  *Compare with, e.g.*, *World Wrestling Ent., Inc. v. Jakks Pac.,*

17  *Inc.*, 530 F. Supp. 2d 486, 520–24 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir.

18  2009); *Kelco Constr., Inc. v. Spray in Place Sols., LLC*, No. 18-cv-5925-SJF-SIL, 2019 WL

19  4467916, at *2–3 (E.D.N.Y. Sept. 18, 2019); *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d

20  1036, 1043–45, 1058–59 (C.D. Cal. 2014).  While Plaintiff alleges that Finicity has

21  inhibited an allegedly nascent market in individually commodified consumer financial

22  data, "[Plaintiff] never alleged that she had wanted or tried to [sell her

23  _____

24  [10] In this regard, Plaintiff's complaints are not too different from the artists complaining about computer models with artificial intelligence capabilities trained on their work, alleging that these companies are

25  stealing their work by reproducing it and creating similar works of a kind the artist would make, thereby "represent[ing] 'unfair competition against'" the artists.  *Andersen v. Stability AI Ltd.*, --- F. Supp. 3d. ----,

26  No. 23-cv-00201-WHO, 2023 WL 7132064, at *2 (N.D. Cal. Oct. 30, 2023) (granting motion to dismiss with leave to amend).  In that case, however, there is a much more readily identifiable market, as that

27  case involved plaintiffs who were established artists (of varying degrees of success) and who had established property rights via their alleged copyrights in several images that were scraped and

28  copied.  *See id.* at ----, *2.

1  data,] . . . rendering '[a]ny supported loss . . . purely speculative.'"  *Diaz*, 420 F.3d at

2  898 (citation omitted).  This is especially so because Plaintiff's data, on its own, might

3  not be valued by others.  This is particularly fatal to any RICO cause of action Plaintiff

4  intends to bring because the phrase "business or property" in 18 U.S.C. § 1964(c) has

5  "restrictive significance[,]" *Oscar*, 965 F.2d at 786 (quoting *Reiter v. Sonotone Corp.*,

6  442 U.S. 330, 339 (1979)), which the Ninth Circuit has repeatedly interpreted to

7  "require[ ] proof of concrete financial loss, and not mere 'injury to a valuable

8  intangible property interest.'"  *Id.* at 785 (quoting *Berg v. First State Ins. Co.*, 915 F.2d

9  460, 464 (9th Cir. 1990)).[11]

10      ### C.   Conclusion

11      Although the three harms Plaintiff identifies in the Complaint are too

12  speculative to support Article III standing on their own, the Court finds that Plaintiff

13  suffered a concrete injury-in-fact when Finicity allegedly violated CAPA and the

14  UCSPA's Targeted Solicitations Ban, which require some sort of affiliation or

15  association with a financial institution before seeking information related to an

16  account holder, thereby creating a material risk of increased identity theft and fraud,

17  the very harm the statutes sought to ameliorate.  *See Patel*, 932 F.3d at 1275 (citing

18  *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1174 (9th Cir. 2018)).

19  Therefore, the Court DENIES Finicity's Motion to Dismiss Plaintiff's Complaint for lack

20  of Article III standing as to Counts 2, 3 and 4.  (*See* MTD at 12–16.)  However, the Court

21  GRANTS the Motion to Dismiss Count 1 in the Complaint, the RICO cause of action,

22  with leave to amend.

23  _____

24  [11] A comparison to other cases in which a plaintiff had RICO standing are instructive.  Unlike in *Ideal Steel V*, Plaintiff does not allege that she is an established competitor in the relevant market and that

25  Finicity has invested new funds to become a direct competitor where it was not before, thereby more clearly alleging how Finicity's RICO activity is taking business from Plaintiff.  *Compare with Ideal Steel*

26  *Supply Corp. v. Anza*, 652 F.3d 310, 324 (2d Cir. 2011).  And unlike in *Mendoza*, Plaintiff has not alleged that Finicity can essentially dictate the prices.  *Compare with Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163,

27  1171 (9th Cir. 2002).  Without such allegations, Plaintiff will have a difficult time proving that Plaintiff lost any sales, as the Ninth Circuit has recognized the practical differences and accompanying difficulties in

28  proving future losses as opposed to current losses.  *See Diaz*, 420 F.3d at 900–01.

## II.    Motion to Compel Arbitration

### A.    Legal Standard

The Federal Arbitration Act ("FAA") governs arbitration agreements.  9 U.S.C. § 2.  The FAA affords parties the right to obtain an order directing that arbitration proceed in the manner provided for in the agreement.  9 U.S.C. § 4.  To decide on a motion to compel arbitration, a court must determine: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.  *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1017 (9th Cir. 2016).  Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67–69 (2010)).  However, parties may use general contract defenses to invalidate an agreement to arbitrate.  *See id.* at 339.  Thus, a court should order arbitration of a dispute only where satisfied that neither the agreement's formation nor its enforceability or applicability to the dispute is at issue.  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010).  "Where a party contests either or both matters, 'the court' must resolve the disagreement," *Granite Rock Co.*, 561 U.S. at 299, because "a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit."  *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) (alteration omitted)).  If a valid arbitration agreement encompassing the dispute exists, arbitration is mandatory.  *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  Under § 3 of the FAA, a court, "upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C. § 3.

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of a valid agreement to arbitrate.  *See*

1   *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).  In

2   resolving a motion to compel arbitration, "[t]he summary judgment standard [of

3   Federal Rule of Civil Procedure 56] is appropriate because the district court's order

4   compelling arbitration 'is in effect a summary disposition of the issue of whether or not

5   there had been a meeting of the minds on the agreement to arbitrate.'"  *Hansen v.*

6   *LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting *Par-Knit Mills, Inc. v.*

7   *Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n.9 (3d Cir. 1980)).  Under this standard of

8   review, "[t]he party opposing arbitration receives the benefit of any reasonable doubts

9   and the court draws reasonable inferences in that party's favor, and only when no

10  genuine disputes of material fact surround the arbitration agreement's existence and

11  applicability may the court compel arbitration."  *Smith v. H.F.D. No. 55, Inc.*, No. 2:15-

12  cv-01293-KJM-KJN, 2016 WL 881134, at *4 (E.D. Cal. Mar. 8, 2016).  A material fact is

13  genuine if "the evidence is such that a reasonable jury could return a verdict for the

14  nonmoving party."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 500 (9th Cir. 1992)

15  (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Conversely,

16  "[w]here the record taken as a whole could not lead a rational trier of fact to find for

17  the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* (quoting *Matsushita Elec.*

18  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

19      **B.    Analysis**

20          **1.    Legal Standards Governing Consent in the Context of Internet-**
21               **Based Agreements**

22          Plaintiff opposes arbitration, mostly relying on the argument that she did not

23  assent.  (*See* Opp'n at 4–19.)  Plaintiff also argues that the arbitration clause is

24  unconscionable.  (*See id.* at 19–20.)  However, as the Court concludes that there is not

25  a valid arbitration agreement in the first place, the Court need not reach the issue of

26  unconscionability.  *See, e.g.*, *Knutson*, 771 F.3d at 569.

27          The Supreme Court has repeatedly proclaimed that "the first principle that

28  underscores all of our arbitration decisions" is that "[a]rbitration is strictly a matter of

28

1   consent." *Lamps Plus, Inc. v. Varela*, 587 U.S. ----, ----, 139 S. Ct. 1407, 1415 (2019)

2   (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)) (first

3   alteration omitted).  Consent is required for every contract, but the "'principle of

4   knowing consent applies with particular force to provisions for arbitration,' including

5   arbitration provisions contained in contracts purportedly formed over the internet[.]"

6   *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 460 (2021) (quoting *Windsor Mills,*

7   *Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972)).  To determine

8   whether knowing consent has been established when forming a contract over the

9   Internet, courts have created a constructive or inquiry notice framework, which

10   requires Finicity to show that: "(1) the website provides reasonably conspicuous notice

11   of the terms to which the consumer will be bound; and (2) the consumer takes some

12   action, such as clicking a button or checking a box, that unambiguously manifests his

13   or her assent to those terms."  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849,

14   856 (9th Cir. 2022).  Finicity and Plaintiff mostly agree on the two-step standard the

15   Court is to apply, which largely derives from interpretation of the *Sellers* case.

16        In the seminal case of *Sellers,* the California appellate court categorized

17   contracts formed over the Internet, distinguishing between: (1) browsewraps, (2) sign-

18   in or sign-up wraps, (3) scrollwraps, and (4) clickwraps.  *See Sellers*, 73 Cal. App. 5th at

19   463 (citing *Selden v. Airbnb, Inc.*, No. 16-cv-00933-CRC, 2016 WL 6476934, at *4

20   (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021)).  As recognized in *Sellers*,

21   California "court[s] and federal courts have reached consistent conclusions when

22   evaluating the enforceability of agreements at either end of the spectrum, generally

23   finding scrollwrap and clickwrap agreements to be enforceable and browsewrap

24   agreements to be unenforceable."  *Id.* at 466.  Although categorization is important, it

25   is not dispositive.  *See id.* at 466 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76

26   (2d Cir. 2017)).  Ultimately, the question is whether the disclosure provides reasonably

27   conspicuous notice, which, though a question of law, is a fact-intensive inquiry.  *See id.*

28   at 473 (quoting *Meyer*, 868 F.3d at 76).

In rejecting the call to adopt any bright-line rules, *see Sellers*, 73 Cal. App. 5th at 474, the *Sellers* court provided criteria that federal courts "have generally considered . . . when determining whether a textual notice is sufficiently conspicuous under California law." *Id.* at 473 (first citing *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 866 (2016); and then citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177–78 (9th Cir. 2014)). To examine whether a textual notice is sufficiently conspicuous to put an individual on notice under California law, courts evaluate factors including: (1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to where the user clicks to consent; (4) the obviousness of an associated hyperlink; and (5) other elements on the screen which clutter or obscure the textual notice. *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (mem.) (non-precedential) (citing *Sellers*, 73 Cal. App. 5th at 473).

The *Sellers* court rejected prior decisions that focused on a hypothetical Internet consumer of varying degrees of "reasonableness" and savvy. *See Sellers*, 73 Cal. App. 5th at 475. Instead, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers[ ]" because they have "complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online." *Id.* at 475–76 (quoting *Long*, 245 Cal. App. 4th at 867). Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound. *Id.* at 476 (quoting *Long*, 245 Cal. App. 4th at 867 (quotation marks omitted)).

### 2. The Form of the Notice

Here, the Court finds that Finicity's Disclosure Page provides a sign-in or sign-up wrap agreement because: (1) the website does take some steps to draw attention to the Terms and Conditions, but (2) the website does not require a user to acknowledge or view the Terms and Conditions before proceeding. *See Sellers*, 73

Cal. App. 5th at 463–64.  And though categorization is not dispositive, *see id.* at 466, some judges have cautioned that, "[g]iven the present state of California law, website designers who knowingly choose sign-in wrap . . . over clickwrap and scrollwrap designs practically invite litigation over the enforceability of their sites' terms and conditions . . . ."  *Berman*, 30 F.4th at 868 n.4 (Baker, J., concurring).

Finicity argues that its disclosure satisfies the five criteria identified in *Sellers*, stating that the Disclosure Page:

> takes up one full screen; the notice is the same legible size as the other text on the screen (other than the title and the "Next" button); the notice informs users that by clicking the "Next" button, they are agreeing to the "Terms and Conditions" and "Privacy Policy," and uses bold black font for the word "Next"; the words "Terms and Conditions" and "Privacy policy" are in red text, clearly indicating they are hyperlinks to those terms; there is a square icon with an arrow pointing to the upper-right corner ([ ]) following the red hyper-linked text, which icon is commonly recognized as evidence of an external link; and the notice is immediately above the "Next" button.

(Arb. Mot. at 8 (citing Compl. at 12 and Figure 8.)

*Viewed in isolation*, the visual elements of Finicity's Disclosure Page are similar to those found to be sufficiently conspicuous in other cases, and that have been reproduced in Appendix B[12] of this Order.  The overall design of the Disclosure Page is relatively clean and free of clutter, the text of the hyperlink is in a separate color

---

[12] For examples of disclosures that did provide reasonably conspicuous notice, *see* Decl. of Jeremy Davie in Supp. of Defendant Payward, Inc.'s Mot. to Compel Arbitration (ECF No. 12-2) at 5, *Singh v. Payward, Inc.*, No. 3:23-cv-01435-CRB, 2023 WL 5420943 (N.D. Cal. Aug. 22, 2023); *Hooper v. Jerry Ins. Agency, LLC*, --- F. Supp. 3d ----, No. 22-cv-04232-JST, 2023 WL 3992130, at *1 (N.D. Cal. June 1, 2023); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 940–41 (N.D. Cal. 2023); *Oberstein v. Live Nation Ent., Inc.*, No. CV 20-3888-GW-GJSx, 2021 WL 4772885, at *1 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023); *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023); *Saucedo v. Experian Info. Sols., Inc.*, No. 1:22-cv-01584-ADA-HBK, 2023 WL 4708015 (E.D. Cal. July 24, 2023); *Pizarro v. QuinStreet, Inc.*, No. 22-cv-02803-MMC, 2022 WL 3357838, at *1 (N.D. Cal. Aug. 15, 2022); *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (mem.) (non-precedential).  For examples of disclosures that did *not* provide reasonably conspicuous notice, *see* Appendix C, citing to the following cases: *Sellers*, 73 Cal. App. 5th at 454; *Berman*, 30 F.4th at 859–61; *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1093 (C.D. Cal. 2023); Decl. of Nina Bayatti in Supp. of Def.'s Mot. to Compel Arbitration and Dismiss and/or Stay Case Ex. 1 (ECF No. 18-1), at 8, *Chabolla v. ClassPass Inc.*, No. 4:23-CV-00429-YGR, 2023 WL 4544598 (N.D. Cal. June 22, 2023).

1   from the black-colored text, and there is a pop-out window icon at the end of the

2   written disclosure by the hyperlink to the Privacy Policy.

3         On the other hand, certain elements of the Disclosure Page undermine the

4   conspicuousness of the notice.  The color of the hyperlinks is not blue, a color that is

5   normally used for hyperlinks, but rather is the same color as the Next button, thus

6   reducing the visibility of the hyperlinked text.  *Compare with Oberstein v. Live Nation*

7   *Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) ("In contrast with the agreements

8   invalidated in *Berman* and *Sellers*, the Terms here were marked in bright blue font and

9   distinguished from the rest of the text."); *Berman*, 30 F.4th at 857 ("Customary design

10   elements denoting the existence of a hyperlink include the use of a contrasting font

11   color (typically blue) and the use of all capital letters, both of which can alert a user

12   that the particular text differs from other plain text in that it provides a clickable

13   pathway to another page.").  Moreover, even though there is a pop-out window icon

14   at the end of the disclosure by the hyperlink to the Privacy Policy, there is not a similar

15   icon for the other hyperlink to the Terms and Conditions containing the arbitration

16   provision, which might suggest that the Privacy Policy is the only hyperlink.  Together,

17   these defects distract a user from the disclosure and the hyperlink to the arbitration

18   provision, which are deemphasized by comparison.  *See Berman*, 30 F.4th at 857.

19         **3.    The Context of the Transaction**

20         While looking at the Disclosure Page in isolation might lead to a conclusion that

21   Finicity provided reasonably conspicuous notice, the Court concludes that in the

22   specific context of this case – where Plaintiff had already entered into a transaction

23   with an entity and was not expecting to agree to yet another set of Terms and

24   Conditions with a heretofore unknown entity – the disclosure is insufficient.  *See*

25   *Sellers*, 73 Cal. App. 5th at 481 ("As the courts in *Long* and *Specht* acknowledged, the

26   transactional context is an important factor to consider and is key to determining the

27   expectations of a typical consumer.")  Though Defendant disputes the relevance of

28   that context, under both California and Ninth Circuit caselaw, context is critical.

In *Sellers*, the California Court of Appeal emphasized that "the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms." *Id.* at 477. Specifically, in determining that the arbitration notice was not sufficiently conspicuous to bind the parties, the *Sellers* court *first* considered the fact that "the transaction [wa]s one in which the typical consumer would not expect to enter into an ongoing contractual relationship, regardless of whether the transaction occurs online or in person." *Id.* at 476.  There, the court noted that it was "questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them." *Id; see also Berman*, 30 F.4th at 868 (Baker, J., concurring) ("That in turn means that the conspicuousness of these sites' textual notices must undergo the most rigorous scrutiny, because a reasonably prudent user would not have been on the lookout for fine print.").

Plaintiff argues that, similar to *Sellers*, the Disclosure Page and the context in which a user encounters and interacts with the Disclosure Page provide "no reason to be *on the lookout* for contractual terms when she clicks Next on the EveryDollar app." (Opp'n at 10 (emphasis added in original).)  Plaintiff points to the fact that she already entered into a separate transaction with Every Dollar before proceeding to Finicity's Disclosure Page where she encountered Finicity for the first time. (*See* Opp'n at 11; Compl. ¶¶ 24–27, 31–34.)  She then cites to cases finding more distinctive features in a notice insufficient in situations where a third-party business tried to bind a consumer who was already in a contractual relation with another business. (*See* Opp'n at 10–16 (citing *Doe v. Massage Envy Franchising, LLC*, 87 Cal. App. 5th 23 (2022) ("*Massage Envy Franchising, LLC*")).)

Finicity counters, arguing that the Court should not consider the context of the transaction in the inquiry notice analysis because "the nonbinding concurrence in *Berman* relies upon *Sellers* as a basis for suggesting that the conspicuousness analysis

1    expressly incorporate consideration of the context of the transaction."  (Arb. Reply at

2    3 n.4.)  More specifically, Finicity argues that, though context may be relevant, "[t]he

3    primary, salient inquiry, focuses on the visual elements of the notice[ ]" (*id.* at 4)

4    because "the Ninth Circuit has not explicitly incorporated an analysis of the

5    circumstances surrounding the internet transaction when analyzing conspicuousness

6    in step one . . . ."  (*Id.* at 7–8 (citing *Oberstein*, 60 F.4th at 516).)

7         However, this Court, like the Ninth Circuit, is bound by the decisions of the

8    California Courts of Appeal absent convincing evidence that the California Supreme

9    Court would decide differently.  *See, e.g.*, *Cmty. Nat'l Bank v. Fid. & Deposit Co. of

10   Maryland*, 563 F.2d 1319, 1321 n.1 (9th Cir. 1977) (collecting cases).  Because whether

11   a valid arbitration agreement was formed is a question of state law, the Court applies

12   *Sellers*.  *See, e.g.*, *Nguyen*, 763 F.3d at 1175 (citing *Hoffman v. Citibank (S. Dakota),

13   N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008) (*per curiam*)).  Moreover, the Ninth Circuit

14   has in fact recognized that the analysis considers the totality of the circumstances

15   which necessarily means that the transaction's context matters for the analysis at step

16   one.  *See Oberstein*, 60 F.4th at 514 (describing the approach in *Berman* as adopting

17   an "objective, totality-of-the-circumstances standard.").  And as conceded by Finicity at

18   oral argument, there are no prior cases that involved the constructive or inquiry notice

19   framework for contracts between a consumer and what amounts to be a subcontractor

20   or intermediary along the production or service chain.  That is, all of the prior cases

21   upon which Finicity relies involve *direct* transactions between a consumer and an

22   ultimate or retail business that the consumer specifically sought.[13]

23   ────────────────────

[13] *See, e.g.*, *Oberstein*, 60 F.4th at 512 (rejecting the putative class members' argument that they did not

24   know that they were contracting with Live Nation Entertainment, the parent company of Ticketmaster,
     when visiting a website to purchase a ticket through Ticketmaster and Live Nation Entertainment);

25   *Berman*, 30 F.4th at 853 (involving plaintiffs, one of whom had previously visited the defendant's
     website, but both of whom had accessed the websites ran by the defendant to purchase items); *Capps

26   v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *1 (E.D. Cal. Apr. 21,
     2023) (involving a plaintiff that "sign[ed] up for 'CreditWorks,' a credit monitoring service with

27   defendant Experian's corporate affiliate, ConsumerInfo.com, Inc.[,]" which are all parent-subsidiaries of
     each other).  *Cf. Knutson*, 771 F.3d at 569 ("[The plaintiff] could not assent to [the defendant's]

28   arbitration provision because he did not know that he was entering into a contract with [the
     defendant].");  *In re Stubhub Refund Litig.*, 2023 WL 5092759, at *2 and n.3 (citing *Knutson*, 771 F.3d at

1      The Ninth Circuit's decision in *Oberstein* is particularly instructive. *See* 60 F.4th

2  at 514–17. There, the court considered a case brought by individuals who had

3  purchased tickets from Ticketmaster. *See id.* at 509. In defending against a motion to

4  compel arbitration, the ticket purchasers, like Plaintiff here, argued that they had not

5  agreed to the arbitration provision. *See id.* at 512. In concluding that there had been

6  sufficient notice of the Terms and Conditions that contained the arbitration clause, the

7  Ninth Circuit relied on the fact that the notice was "conspicuously displayed directly

8  above or below the action button at each of three independent stages – when

9  creating an account, signing into an account, and completing a purchase[,]" that the

10  notice clearly indicated continued use would bind the user to the Terms and

11  Conditions, and that the hyperlink to the Terms and Conditions was "conspicuously

12  distinguished from the surrounding text in bright blue font, making its presence

13  readily apparent." *Oberstein*, 60 F.4th at 515–16. Importantly, the Ninth Circuit

14  distinguished *Berman* and *Sellers*, not by discounting or ignoring the circumstances

15  surrounding the transaction, but *because of them*. *See id.* The court stated: "in

16  contrast with the noncommittal free trial offered in *Sellers*, the context of this

17  transaction, requiring a full registration process, reflected the contemplation of 'some

18  sort of continuing relationship' that would have put users on notice for a link to the

19  terms of that continuing relationship." *Id.* at 517.[14] Far from disavowing reliance on

20  the circumstances and context of a transaction, *Oberstein* compels it.

21  *////*

---

23  565–66; and holding that the "district court did not err in denying StubHub's motion to compel arbitration as to [one plaintiff] who signed into the website *after* his ticket purchase.").

24

25  [14] A review of the district court's decision in *Oberstein* reflects how different that case is from the transaction at issue here. *See* No. 20-cv-3888-GW-GJSx, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021),

26  *aff'd* 60 F.4th 505 (9th Cir. 2023). In *Oberstein*, the plaintiffs, aggrieved purchasers complaining about paying prices that are higher than would exist in a competitive market, had to specifically search for the defendant's website to complete the purchase. *See id.* at *2. In fact, each plaintiff had made multiple

27  purchases with the defendant on its website or online platform before with each making at least two and one making over 40 prior purchases, *see id.* Moreover, Live Nation Entertainment and Ticketmaster

28  are not unknown businesses.

1    In the unique context of this transaction, it is not the case that Finicity engaged

2 Plaintiff on the Every Dollar app at a time where Plaintiff "signed up for an account[ ]

3 and entered h[er] [ ] [financial] information with the intention of entering into a

4 *forward-looking relationship* with [the defendant]." *Sellers*, 73 Cal. App. 5th at 477

5 (quoting *Meyer*, 868 F.3d at 80).  Plaintiff, to even access Finicity's Disclosure Page,

6 had to first pay for a service through a premium subscription with Every Dollar that

7 purportedly gave her access to the bank-linking service provided by the third-party

8 Finicity.  (*See* Compl. ¶¶ 24–27; Opp'n at 6–10 (citations omitted).)  An Internet user

9 would not have expected to encounter yet another, heretofore unknown third-party in

10 this situation, making it even more important that the Terms and Conditions were

11 displayed in a prominent fashion.

12    Plaintiff's situation is like Jane Doe in *Massage Envy Franchising, LLC*, in which

13 the court likewise refused to enforce an arbitration agreement.  There, Jane Doe had a

14 monthly membership with an independently owned Massage Envy franchise, which, in

15 exchange for a monthly fee, provided Jane Doe with one massage per month and

16 others at a reduced rate.  At one massage, Jane Doe was handed an electronic tablet

17 as part of a check-in process which involved two electronic forms, one of which

18 involved an agreement with Massage Envy Franchising ("MEF"), a separate

19 corporation with which Jane Doe had no prior relationship.  *See Massage Envy*

20 *Franchising, LLC*, 87 Cal. App. 5th at 26–27.  On the "In-Store Application," MEF

21 provided a clickwrap agreement that first presented a window that contained all of the

22 Terms and Conditions with the franchise location for Jane Doe to scroll through and

23 read, and then presented towards the bottom of that same window a separate

24 hyperlink to the Terms and Conditions with MEF near a disclosure stating "I agree and

25 assent to the Terms of Use Agreement" next to a box that Jane Doe had to check.  *See*

26 *id.* at 27–29.

27 ////

28 ////

On the basis of the clickwrap agreement,[15] MEF tried to enforce an arbitration clause.  The trial court held that there was no mutual assent, and the appellate court affirmed, relying in substantial part on the fact that Jane Doe had no prior relationship with MEF and "had no reason to believe that the check-in process or the massage involved MEF[ ]" because she "had a pre-existing contractual relationship . . . with the San Rafael location, to which MEF was not a party" *Id.* at 31; *see id.* at32, 34–35.

The same is true in this case, as Plaintiff had just entered into an agreement with Every Dollar immediately prior to interacting with Finicity for the first and only time via the Disclosure Page.  *Compare with Massage Envy Franchising, LLC*, 87 Cal. App. 5th at 34 ("Plaintiff here had no reason to expect that checking in for her massage at the San Rafael Massage Envy would involve her entering into any ongoing contractual relationship of any sort with MEF, an entity that was a stranger to her.").  Thus, Plaintiff could have viewed the steps taken to proceed past the Disclosure Page as "part of the process of reviewing, signing, and agreeing to the [Terms and Conditions] between her and the [Every Dollar app], rather than as an indication of assent to an entirely different contract with an entirely different entity." *Id.* at 32.

The Ninth Circuit has similarly held in another case that the plaintiff could not assent to the defendant's arbitration provision because the plaintiff did not know that she was entering into a contract with the defendant.  *See Knutson*, 771 F.3d at 569.  There, the Ninth Circuit considered  the "economic and practical considerations involved in selling services to mass consumers," *id.* at 568 (citation omitted), but nevertheless found that the defendant could have required that its affiliates disclose the nature of the defendant's and affiliate's relationship or to at least explain the agreement between the defendant and the affiliate to the consumer before then asking for the consumer's consent.  *See id.* at 567.  Finicity could likewise remedy this

---

[15] *See Massage Envy Franchising, LLC*, 87 Cal. App. 5th at 32–34 (describing why this clickwrap agreement was deficient "in its context[.]"); *also Sellers*, 73 Cal. App. 5th at 463 ("A 'clickwrap' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available."  (citations omitted)).

1   problem by requiring the FinTech apps like Every Dollar to disclose this relationship,

2   as Finicity would have a pre-existing relationship with these entities.  Alternatively,

3   Finicity could have used a more robust form of disclosure, such as a clickwrap

4   agreement that required the user to review the Terms and Conditions before

5   proceeding.  *See Oberstein*, 60 F.4th at 517 (noting that, while the defendants' notice

6   provided reasonably conspicuous notice, "this hybrid form of agreement is not

7   without its risks and invites second-guessing[,]" and that "clickwrap is the safest

8   choice."  (citing *Berman*, 30 F.4th at 868 n.4 (Baker, J., concurring))).  Given this

9   transaction's context, if the disclosure in *Massage Envy Franchising, LLC* was not

10   sufficient, which included some functions that made it more akin to a clickwrap

11   agreement by including an "I agree" checkbox, *Massage Envy Franchising, LLC*, 87

12   Cal. App. 5th at 32, then Finicity's Disclosure Page cannot be sufficient.  *See Sellers*, 73

13   Cal. App. 5th at 476–77.

14       **C.**    **Conclusion**

15       For the above reasons, the Court concludes that Finicity has not established by

16   a preponderance of the evidence that Plaintiff had constructive notice of the linked

17   Terms and Conditions that contained an arbitration clause, and, therefore, that Finicity

18   has failed to prove the existence of an agreement to arbitrate.  *See Berman*, 30 F.4th

19   at 858.  The Court accordingly DENIES Finicity's Motion to Compel Arbitration (ECF

20   No. 17).  As a result, the Court need not consider Finicity's arguments on waiver or

21   striking the class allegations.

22   **III.**    **Motion to Dismiss Under Rule 12(b)(6)**

23       **A.**    **Legal Standard**

24       A party may move to dismiss for "failure to state a claim upon which relief can

25   be granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint

26   lacks a "cognizable legal theory" or if its factual allegations do not support a

27   cognizable legal theory.  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th

28   Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

1    The court assumes all factual allegations are true and construes "them in the light

2    most favorable to the nonmoving party."  *Steinle v. City & Cnty. of San Francisco*, 919

3    F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d

4    1480, 1484 (9th Cir. 1995).  If the complaint's allegations do not "plausibly give rise to

5    an entitlement to relief[,]" the motion must be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662,

6    679 (2009).

7         A complaint need contain only a "short and plain statement of the claim

8    showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed

9    factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule

10   demands more than unadorned accusations; "sufficient factual matter" must make the

11   claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or

12   formulaic recitations of elements do not alone suffice.  *See id.*  This evaluation of

13   plausibility is a context-specific task drawing on "judicial experience and common

14   sense."  *Id.* at 679.

15        **B.    Analysis**

16             **1.    The UCSPA's Targeted Solicitations Ban Claim**

17        Finicity has two challenges to Plaintiff's class action claim under the UCSPA's

18   Targeted Solicitations Ban.  First, Finicity argues that the UCSPA "bars class actions for

19   money damages unless the defendant's actions violate an existing order,

20   administrative rule or consent decree, none of which Plaintiff has pleaded here."

21   (MTD Reply at 11 (citing *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1281 (D.

22   Utah 2020)).)  Second, Finicity argues that Plaintiff failed to plead her claim with

23   particularity to satisfy Federal Rule of Civil Procedure 9(b).  (*See id.* at 12.)

24        Taking Finicity's second argument first, Plaintiff satisfies Rule 9(b) and provides

25   "'the who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-*

26   *Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137

27   F.3d 616, 627 (9th Cir. 1997)).  The "who" is Finicity.  The "what" is the deceptively

28   displayed Disclosure Page.  (*See* Compl. ¶¶ 1, 15, 24, 35–36.)  The "where" is every

1    location at which a user of a FinTech app connected to their financial institution using

2    Finicity, which, in Plaintiff's case, was in California.  The "when," as defined by the

3    proposed classes (*see id.* ¶ 67), is every transaction like Plaintiff's since 2014.  The

4    "how" is the alleged trafficking in counterfeit marks and configuring the Disclosure

5    Page in a way that does not provide constructive notice.  Here, the allegations are

6    specific enough to give Finicity notice of the particular misconduct so that Finicity can

7    defend itself, thus satisfying the purposes of Rule 9(b).  *See Vess*, 317 F.3d at 1106

8    (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).

9        As for Finicity's first argument, the Court finds that it is premature at this stage

10   because Plaintiff has not brought forth a motion to certify the classes, and so the

11   question of whether any particular class should be certified and brought is not before

12   the Court.  *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,

13   No. 15-cv-6549-CM, 2018 WL 7197233, at *51 (S.D.N.Y. Dec. 26, 2018) ("Courts that

14   have examined the class action damages bar under the UCSPA have tended to defer

15   the question of whether an action meets the statutory prerequisites until later stages

16   of the case.").  In particular, the UCSPA generally prohibits class actions seeking

17   recovery of actual damages, *see* Utah Code Ann. § 13-11-19(2), but § 13-11-19(4)(a)

18   allows a consumer to bring a class action for actual damages if the plaintiff can show

19   that the act or practice was previously announced as prohibited before the consumer

20   transaction on which the action is based was completed.  As a result, some courts find

21   it proper to defer consideration of these issues "because [Finicity's] 'arguments focus

22   on whether Plaintiff[ ] can pursue *class* claims under [Utah] state consumer law[ ], not

23   on whether the claims themselves are well pled[,]' which is the only 'question [that] is

24   at issue in a Rule 12(b)(6) motion to dismiss.'"  *Parrish v. Volkswagen Grp. of Am., Inc.*,

25   463 F. Supp. 3d 1043, 1062 n.17 (C.D. Cal. 2020) (quoting *In re Volkswagen "Clean*

26   *Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 920 (N.D. Cal.

27   2018)).  As a result, because the Court has found that Plaintiff's allegations are

28

1   pleaded with sufficient particularity, the Court reserves the question of whether a class

2   action for actual damages may proceed until Plaintiff moves to certify such a class.

3       Because Plaintiff sufficiently pleads "'the who, what, when, where, and how' of

4   the misconduct charged[,]" *Vess*, 317 F.3d at 1106 (quoting *Cooper*, 137 F.3d at 627),

5   Plaintiff has a plausible claim.  As a result, the Court DENIES Finicity's Motion to

6   Dismiss Count Two.  (*See* MTD at 19–21.)

7                   **2.      Utah Unjust Enrichment Claim**

8       Under Utah principles of equity, a cause of action for unjust enrichment

9   requires the plaintiff to show that: (1) a benefit was conferred; (2) that the defendant

10  appreciated or had knowledge of the benefit; and (3) that the defendant accepted or

11  retained the benefit under circumstances making it inequitable to retain the benefit

12  without making payment of its value.  *See Thorpe v. Washington City*, 2010 UT App

13  297, ¶ 27, 243 P.3d 500 (2010).  Finicity argues that Plaintiff cannot state a cause of

14  action for unjust enrichment, because Plaintiff has failed to "'affirmatively show a lack

15  of an adequate remedy at law on the face of the pleading.'"  (MTD Reply at 14

16  (quoting *Arnson v. My Investing Place L.L.C.*, No. 2:12-CV-865, 2013 WL 5724048, at

17  *6 (D. Utah Oct. 21, 2013)).)  Finicity's argument fails for two reasons.

18      First, unlike the plaintiff in *Arnson*, Plaintiff pleads all of the required elements.

19  *Compare with Arnson*, 2013 WL 5724048, at *6.  The court in *Arson* dismissed the

20  plaintiff's claim for failing to (1) affirmatively plead the lack of an adequate remedy at

21  law in the complaint, and (2) allege that the defendant received a benefit.  *See Arnson*,

22  2013 WL 5724048, at *6.  Here, Plaintiff alleges that she and the putative class

23  members conferred a benefit on Finicity in the form of the information Finicity

24  obtained through its financial data aggregation (*see* Compl. ¶ 104), that Finicity

25  appreciated and knew it received this benefit, as shown by Finicity's monetization of

26  its financial data aggregation (*see id.* ¶ 105), and that Finicity should not receive this

27  benefit because that would be "unjust because Defendant Finicity was only able to

28

1   obtain the benefit under false pretenses and through deception" (*id.* ¶ 106).  This is

2   enough to allege the three required elements.  *See Arnson*, 2013 WL 5724048, at *6.

3        Second, Plaintiff does allege that there is an inadequate remedy at law (*see*

4   Compl. ¶ 107), and Plaintiff may plead in the alternative by alleging that there is no

5   injury under the unjust enrichment claim while also seeking damages or injunctive

6   relief under the other claims.  Under Utah law, it is true that "if a legal remedy is

7   available, such as breach of an express contract, the law will not imply the equitable

8   remedy of unjust enrichment."  *Johnson*, 500 F. Supp. 3d at 1291–92 (quoting *Am.*

9   *Towers Owners Ass'n, Inc. v. CCI Mech., Inc.*, 930 P.2d 1182, 1193, 306 Utah Adv. Rep.

10  3 (Utah 1996), *abrogated on other grounds by Davencourt at Pilgrims Landing*

11  *Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 2009 UT 65, 221 P.3d 234

12  (Utah 2009)).  However, Plaintiff alleges that there is not an adequate remedy, and, at

13  this stage, Plaintiff need not prove that there will not be an adequate remedy because

14  "proof of 'the absence of an adequate remedy at law is *not* an element of the *prima*

15  *facie* case for unjust enrichment . . .'"  *Johnson*, 500 F. Supp. 3d at 1292 (quoting *In re*

16  *Processed Egg Prod. Antitrust Litig.*, 851 F. Supp. 2d 867, 917 (E.D. Pa. 2012) (citation

17  omitted)).

18       Moreover, dismissal would only be appropriate "'if it appears to a certainty that

19  the plaintiff would be entitled to no relief under any state of facts which could be

20  proved in support of the claim . . . .'"  *Johnson*, 500 F. Supp. 3d at 1293 (quoting *AGTC*

21  *Inc. v. CoBon Energy LLC*, 2019 UT App 124, ¶ 22, 447 P.3d 123 (2019)).  That is not

22  the case here as Plaintiff's other claims could fail, thereby leaving her with no remedy

23  at law, which is the point of equitable remedies such as unjust enrichment that are

24  intended to provide a remedy where no legal remedy remains.  *See, e.g.*, *Rawlings v.*

25  *Rawlings*, 2010 UT 52, ¶ 29, 240 P.3d 754, 763 (Utah 2010) ("We have also noted that

26  unjust enrichment [under Utah state law] plays an important role as a tool of equity:

27  '[u]njust enrichment law developed to remedy injustice where other areas of the law

28

1    could not,' and therefore 'must remain a flexible and workable doctrine.'"  (quoting

2    *Jeffs v. Stubbs*, 970 P.2d 1234, 1245, 351 Utah Adv. Rep. 3 (Utah 1998))).

3           Accordingly, the Court DENIES Finicity's Motion to Dismiss Count Three.  (*See*

4    MTD at 23–24.)

5                   **3.      CAPA Claim**

6           Finicity has two arguments challenging Count Four concerning Plaintiff's CAPA

7    claim.  Finicity's first argument rests on Finicity establishing mutual assent, which

8    would preclude finding that Plaintiff was deceived or that Finicity misrepresented itself

9    to Plaintiff as a financial institution.  (*See* MTD Reply at 12–14.)  Having found that the

10   Disclosure Page does *not* provide reasonably conspicuous notice, *see supra* Part II.B,

11   Finicity's first argument fails.  Finicity's second argument is that Plaintiff fails to state a

12   claim.  (*See* MTD at 21–22.)  Finicity seems to argue that Plaintiff must establish that

13   the conduct alleged falls within the scope of "'phishing,' the very activity the Act

14   protects against."  (MTD at 21.)  But the California Legislature has already provided a

15   definition of "phishing" for this Court, which is an "unlawful request[ ] by

16   misrepresentation[,]" and, more specifically, is when "any person, by means of a *Web*

17   *page*, *electronic mail message*, or otherwise through the use of the *Internet*, [ ]

18   solicit[s], request[s], or take[s] any action to induce another person to provide

19   *identifying information* by representing itself to be a business without the authority or

20   approval of the business."  Cal. Bus. & Prof. Code § 22948.2 (emphasis added); *see*

21   *also id.* § 22948.1 (defining the italicized terms in § 22948.2).  According to the

22   California Legislature's definition of "phishing," Finicity's alleged conduct falls within

23   the scope of CAPA because: (1) Finicity mispresented itself to be the financial

24   institution for consumers by using counterfeit marks (*see* Compl. ¶¶ 2, 35–36 and

25   Figures 3–4, 10–18) when (2) "taking action" by deceptively displaying the Disclosure

26   Page that does not provide reasonably conspicuous notice (*see* Compl. ¶¶ 24–36 and

27   Figures 7–18) to (3) obtain "identifying information" in the form of the account

28   password and unique username that can be used to access an individual's financial

1    accounts.  *See* Cal. Bus. & Prof. Code §§ 22948.1–2.  That is enough to state a claim

2    under CAPA.  *See Gonzalez v. Bryant*, No. 2:19-cv-02155-MCE-CKD, 2021 WL

3    3662944, at *2 (E.D. Cal. Aug. 18, 2021) ("Cases discussing [CAPA] are limited, but

4    claims defeating motions to dismiss appear to follow the plain language of the statute,

5    and involve such circumstances, by way of example, as when a defendant induces the

6    provision of account credentials by falsely representing itself as a representative of a

7    plaintiff's financial institution.").

8        As for a remedy, CAPA authorizes relief for a person that was "adversely

9    affected by a violation of Section 22948.2 . . . [and] only against a person who has

10   directly violated Section 22948.2."  *Id*. § 22948.3(a)(2).  Here, Finicity directly

11   "violated" CAPA to the extent that it did not have a license to use the allegedly

12   counterfeit marks.  Plaintiff was "adversely affected by [Finicity's] violation of Section

13   22948.2," *id*. § 22948.3(a)(2), by losing control over her personal information, *see*

14   (Compl. ¶¶ 15, 18, 53, 85;) *Eichenberger*, 876 F.3d at 983, and having to monitor her

15   credit (*see* Compl. ¶ 59).  These allegations are sufficient at this stage, as these were

16   the sorts of harms envisioned by the California Legislature.  *See* CAPA's Second

17   Senate Floor Analyses, at 2.  *Compare with Gordon v. Virtumundo, Inc.*, 575 F.3d 1040,

18   1053 (9th Cir. 2009) (defining "adversely affected by" in the Controlling the Assault of

19   Non-Solicited Pornography and Marketing or "CAN-SPAM" Act of 2003, 15 U.S.C.

20   § 7701, *et seq.*, by reference to the harms identified in the Committee Report).

21       Therefore, the Court DENIES Finicity's Motion to Dismiss Count Four of the

22   Complaint.  (*See* MTD at 21–22.)

23                    **4.      Tolling and Statutes of Limitations**

24       Finally, Finicity argues that any statute of limitations period has passed and that

25   equitable tolling would not apply to save Plaintiff's claims.  (*See* MTD Reply at 15.)

26   However, as the parties concede, equitable tolling is generally determined by matters

27   outside of the pleadings (*see* Opp'n at 34–35; MTD Reply at 15).  Moreover, it is not

28

1  clear from the face of the Complaint that the claim is time-barred.  Finicity may renew

2  its statute of limitations argument at the appropriate time.

3      **C.    Conclusion**

4      For the reasons set forth above, the Court DENIES Finicity's Motion to Dismiss

5  Counts 2, 3, and 4 of the Complaint (ECF No. 19).

6  **IV.    Motion to Transfer Venue**

7      **A.    Legal Standard**

8      A transfer motion made under 28 U.S.C. § 1404(a) requires two findings:

9  (1) that the proposed court is one where the action might have been brought, and

10  (2) that the convenience of the parties and witnesses in the interest of justice favor

11  transfer.  *See Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985).  For the first

12  part of the test, courts look to whether an action "might have been brought" in that

13  district by reference to whether that court would have original jurisdiction over the

14  matter and venue would be proper.  *See id.* (citing *Hoffman v. Blaski*, 363 U.S. 335,

15  343–44 (1960) and *Van Dusen v. Barrack*, 376 U.S. 612, 620 (1964)).  For the second

16  part of the test, courts look to the factors used at common law for establishing *forum*

17  *non conveniens*, but require a lesser showing of inconvenience than that required for

18  dismissal.  *See Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955).  Section 1404(a) is

19  intended to place discretion in the district court to adjudicate motions for transfer

20  according to an "individualized, case-by-base consideration of convenience and

21  fairness."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*,

22  376 U.S. at 622).

23      Where no forum selection clause is involved, a district court considering a

24  transfer motion under 28 U.S.C. § 1404(a) must evaluate both the convenience of the

25  parties and various public-interest considerations.  *See Atl. Marine Const. Co. v. U.S.*

26  *Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 and n.6 (2013).  The relevant private

27  interests to consider are: (1) the relative ease of access to sources of proof; (2) the

28  availability of compulsory process for attendance of unwilling witnesses, and the costs

1    of obtaining attendance of willing witnesses; (3) the possibility to view the premises, if

2    view would be appropriate to the action; and all other practical considerations that

3    make conducting a trial easy, expeditious, and inexpensive.  *See id.* (quoting *Piper*

4    *Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).  Relevant public-interest factors

5    include: (1) the administrative difficulties flowing from court congestion; (2) the local

6    interest in having localized controversies decided at home; and (3) the interest in

7    having the trial of a diversity case in a forum that is at home with the law.  *See id.*  The

8    Ninth Circuit has identified the following factors as also being relevant: (1) the location

9    of where the relevant agreements were negotiated and executed; (2) the respective

10   parties' contacts with the forum; (3) the contacts relating to the plaintiff's cause of

11   action in the chosen forum; and (4) the difference in the costs of litigation in the two

12   forums.  *See Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000).

13         Finally, the plaintiff's choice is owed deference because the plaintiff is

14   presumed to have picked her convenient home forum.  *See, e.g.*, *Ranza v. Nike, Inc.*,

15   793 F.3d 1059, 1076 (9th Cir. 2015) (quoting *Piper Aircraft Co.*, 454 U.S. at 255).  This

16   deference is "far from absolute," *id.* (quoting *Lockman Found. v. Evangelical All.*

17   *Mission*, 930 F.2d 764, 767 (9th Cir. 1991)), particularly where the plaintiff brings a

18   class or derivative action claim, *see, e.g.*, *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir.

19   1987).  But "less deference is not the same thing as no deference."  *Ayco Farms, Inc. v.*

20   *Ochoa*, 862 F.3d 945, 950 (9th Cir. 2017) (quoting *Ravelo Monegro v. Rosa*, 211 F.3d

21   509, 514 (9th Cir. 2000)).  The plaintiff's choice is only "entitled to minimal

22   consideration" where "the operative facts have not occurred within the forum and the

23   forum has no interest in the parties or subject matter[.]"  *Lou*, 834 F.2d at 739.

24         **B.     Analysis**

25         For step one, venue would be proper in Utah.  Finicity is domiciled there, and

26   there would still be minimal diversity under the Class Action Fairness Act.  *See* 28

27   U.S.C. § 1391(b)(1).  For step two, the Court concludes that, because the factors cut

28   both ways, Plaintiff's choice of forum, even if owed less deference, is still "entitled to

46

1  [more than] minimal consideration[,]" *Lou*, 834 F.2d at 739 (citing *Pac. Car & Foundry*

2  *Co. v. Pence*, 403 F.2d 949, 954 (9th Cir. 1968)).

3       The private interests, on net, favor Utah.  Most of the evidence will be in Utah

4  (or New York), where this Court will not have the ability to compel third-party

5  testimony as those parties will be beyond the100 mile range of this Court's jurisdiction

6  under Federal Rule of Civil Procedure 45(c), even through video testimony, *see In re*

7  *Kirkland*, 75 F.4th 1030, 1051–52 (9th Cir. 2023).  However, there is no need to view

8  any premises in Utah, and most of the relevant evidence from Finicity will come in the

9  form of documents, not testimony, thus reducing any inconvenience of having venue

10  in California.

11       The public interest factors favor both venues.  Even though the Eastern District

12  has a heavy caseload, the District of Utah is not appreciably faster at taking cases to

13  trial.  (*See* MTD Reply at 3 n.2.)  Similarly, even though there are two claims under Utah

14  state law (Counts Two and Three raising the UCSPA's Targeted Solicitations Ban claim

15  and the Utah unjust enrichment claim, respectively), Plaintiff also brings a claim under

16  CAPA, and the Utah unjust enrichment claim is not a claim but an alternative pleading

17  that can only arise if there is no other claim or remedy, meaning that there is only one

18  substantive state-law claim for each State from which Plaintiff can recover.  Finally,

19  Finicity contends that a Utah court should be the first to hear a case regarding the

20  UCSPA's Targeted Solicitations Ban.  (*See* MTD at 10–11.)  But unlike the cases Finicity

21  cites, the UCSPA's Targeted Solicitations Ban is not part of "an area of [Utah] law that

22  has been persistently problematic for [Utah] courts[,]" *Clisham Mgmt., Inc. v. Am. Steel*

23  *Bldg. Co.*, 792 F. Supp. 150, 158 (D. Conn. 1992), or that "require[s] the application of

24  a complex body of law to the vast universe of facts uncovered by" discovery.  *Sheffer v.*

25  *Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 380 (D.D.C. 2012).

26       The factors identified by the Ninth Circuit favor California, even if only slightly.

27  Plaintiff's only contacts are in California, and, more specifically, in the Eastern District.

28  (*See* Compl. ¶ 15.)  For costs, both states are expensive, but the costs would be

1   greater to Plaintiff, as an individual, even if as a class representative, to litigate in Utah

2   than it would be for Finicity, a multinational corporation, to litigate in California.  *See,*

3   *e.g.*, *In re Ferrero Litig.*, 768 F. Supp. 2d. 1074, 1081 (S.D. Cal. 2011) (quoting *Shultz v.*

4   *Hyatt Vacation Mktg. Corp.*, No. 10-CV-04568-LHK, 2011 WL 768735, at *6 (N.D. Cal.

5   Feb. 28, 2011)); *Sheffer*, 873 F. Supp. 2d at 376 (citing *Veney v. Starbucks Corp.*, 559

6   F. Supp. 2d 79, 84 (D.D.C. 2008)).

7   **C.   Conclusion**

8   Even though there are arguments on either side, Plaintiff's choice of forum is

9   still entitled to deference because her cause of action arose in the Eastern District and

10  she is at home here.  Where, as here, transfer would do no more than shift the burden

11  or inconvenience, the movant has not met its burden.  *See Shultz*, 2011 WL 768735, at

12  *6 ("Transfer is not appropriate if it simply shifts the inconvenience from one party to

13  another."  (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843

14  (9th Cir. 1986))).  As a result, the Court DENIES Finicity's Motion to Transfer Venue.

15  **ORDER**

16  For the reasons set forth above, the Court: (1) DENIES Finicity's Motion to

17  Compel Arbitration (ECF No. 17) and (2) GRANTS IN PART AND DENIES IN PART

18  Finicity's Motion to Transfer Venue or, in the Alternative, Dismiss Complaint (ECF No.

19  19).  Specifically, the Court GRANTS Finicity's Motion to Dismiss Count One of the

20  Complaint, the RICO claim, with leave to amend.  However, the Court DENIES

21  Finicity's Motion to Dismiss the remaining counts.  Plaintiff has 30 days from this

22  Order's docketing to file the Amended Complaint.

23

24  IT IS SO ORDERED.

25  Dated:   **February 12, 2024**

26  Hon. Daniel J. Calabretta
    UNITED STATES DISTRICT JUDGE

27

28

**APPENDIX**

I.    **Appendix A – Figure 8 of the Complaint: The Disclsoure Page**[16]

    

## Share your PNC Bank data

We use Finicity, a Mastercard company
to gather data from PNC Bank.

 Your data will only be used with your
permission

 Your data is secured by encryption

By pressing **Next**, I agree to Finicity, a Mastercard
company Terms and conditions and Privacy policy



**Next**



---

[16] (*See* Compl. at 12; ECF No. 21 ¶¶ 5–8 (declaring the veracity of Figure 8 as "The screenshot reflected in Figure 8 to Plaintiff's Complaint and reproduced below (the 'Disclosure Page') accurately depicts the format and content of the information presented to users of Finicity's services that allow users to connect their financial accounts with personal finance-related apps.").)

## II.   Appendix B – Sign-in Windows That Provided Reasonably Conspicuous Notice.

### A.   *Singh* Webpage Sign-in Window[17]



DocuSign Envelope ID: 8B09AB7-525I-4EA-88?1-1A689B0AF55

Case 3:23-cv-01435-CRB   Document 12-2   Filed 05/30/23   Page 5 of 6

shown below to illustrate the color change seen by an individual signing up for a Kraken account. Without the box checked, the "Create account" icon below the user information is grey:

19.   Once the box is checked, the "Create account" icon turns dark purple:

20.   After the user has entered his or her login credentials and checked the box indicating agreement to Kraken's TOS and Privacy Policy, the next step is to click the (now dark purple) "Create account" button. After agreeing to Kraken's TOS and clicking "Create account," the user proceeds to further steps in account creation, *e.g.*, specifying an address, telephone number, source of funds, investment selections, etc.

5

DAVIE DECLARATION IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

---

[17] *See* Decl. of Jeremy Davie in Supp. of Defendant Payward, Inc.'s Mot. to Compel Arbitration (ECF No. 12-2) at 5, *Singh v. Payward, Inc.*, No. 3:23-cv-01435-CRB, 2023 WL 5420943 (N.D. Cal. Aug. 22, 2023) (citation for decision).

**B.**   *Hooper* **Webpage Sign-in Window**[18]



**C.**   *Houtchens* **FitBit Windows Webpage Sign-in Windows**[19]

---

[18] *See Hooper v. Jerry Ins. Agency, LLC*, --- F. Supp. 3d ----, No. 22-cv-04232-JST, 2023 WL 3992130, at *1 (N.D. Cal. June 1, 2023).

[19] *See Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 940–41 (N.D. Cal. 2023).

**D.** *Houtchens* **Fitbit Website Sign-in Window**



(Fitbit.com)

**E.** *Houtchens* **Fitbit Mobile Webpage Sign-in Window**



Fitbit Mobile Application

B-3

**F.**   ***Houtchens* Fitbit MacOSX Webpage Sign-in Window**



MacOSX

**G.**   ***Oberstein* Webpage Sign-in Window[20]**



---

[20] (*See* ECF No. 22-1 at 2.)  *See also Oberstein v. Live Nation Ent., Inc.*, No. CV 20-3888-GW-GJSx, 2021 WL 4772885, at *1 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023).

1

### H.   *Capps* and *Saucedo* Webpage Sign-in Windows[21]

2



3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [21] (*See* ECF No. 22-2 at 2.)  *See also Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023); *Saucedo v. Experian Info. Sols., Inc.*, No. 1:22-cv-01584-

28   ADA-HBK, 2023 WL 4708015 (E.D. Cal. July 24, 2023).

## I.  *Pizarro* Webpage Sign-in Window[22]





---

[22] *See Pizarro v. QuinStreet, Inc.*, No. 22-cv-02803-MMC, 2022 WL 3357838, at *1 (N.D. Cal. Aug. 15, 2022).

**J.    *In re Stubhub Refund Litig.* Webpage Sign-in Window**[23]



---

[23] *See In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (mem.) (non-precedential).

III.   **Appendix C – Sign-in Windows That Did Not Provide Reasonably Conspicous Notice.**

A.     *Sellers* **Webpage Sign-in Window[24]**



---

[24] *See Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 454 (2021).

**B.** *Sellers* **Mobile Webpage Sign-in Window**



1

## C.  *Berman* Webpage Sign-in Window[25]





---

[25] *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 859–61 (9th Cir. 2022).

### D.   *Berman* Mobile Webpage Sign-in Window



**E.**   *In re Stubhub Refund Litig.* **Mobile Webpage Sign-in Window**[26]

**Mobile Application Registration Screen**



---

[26] *See In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (mem.) (non-precedential).

**F.**    ***Sadlock*** **Email Sign-in Window**[27]



---

[27] *See Sadlock v. Walt Disney Co.*, No. 22-cv-09155-EMC, 2023 WL 4869245, at \*4 (N.D. Cal. July 31, 2023).

1

## G.    *Serrano* **Webpage Sign-in Window**[28]

2



28 *See Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1093 (C.D. Cal. 2023).

### H.    *Chabolla* Webpage Sign-in Window[29]



---

[29] *See* Decl. of Nina Bayatti in Supp. of Def.'s Mot. to Compel Arbitration and Dismiss and/or Stay Case Ex. 1 (ECF No. 18-1), at 8, *Chabolla v. ClassPass Inc.*, No. 4:23-CV-00429-YGR, 2023 WL 4544598 (N.D. Cal. June 22, 2023) (providing citation for decision).